620 F.2d 1159
 Ammoneta SEQUOYAH, Richard Crowe, Gilliam Jackson,
Individually and representing other Cherokee Indians
similarly situated; the Eastern Band of Cherokee Indians;
and the United Ketooah Band of Cherokee Indians, Appellants,
v.
TENNESSEE VALLEY AUTHORITY, Appellee.
 No. 79-1633.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 14, 1980.
Decided April 15, 1980.
 
 Robert M. Stivers, Jr., Leibowitz, Watson, Kressin, Stivers & Erickson, Knoxville, Tenn., Ben Oshel Bridgers, Holt, Haire & Bridgers, Sylva, N. C., Walter Echo-Hawk, Kurt Blue Dog, Native American Rights Fund, Boulder, Colo., Ellen Leitzer, Susan Tomita, National Indian Youth Council, Albuquerque, N. M., for appellants.
 Herbert S. Sanger, Jr., General Counsel, Tennessee Valley Authority, James E. Fox, Knoxville, Tenn., for appellee.
 Bruce J. Ennis, American Civil Liberties Union, New York City, Nancy Stearns, Center for Constitutional Rights, New York City, for amici curiae Nat'l Council of Churches of Christ in USA, et al.
 David H. Getches, University of Colorado, School of Law, Boulder, Colo., Bertram E. Hirsch, Bellerose, N. Y., Jon Van Dyke, Native Hawaiian Legal Corp., Honolulu, Hawaii, for amici curiae.
 Before LIVELY, KEITH and MERRITT, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 This appeal requires the court to make a determination of the legal efficacy of a claim based on the Free Exercise Clause of the First Amendment.[1]
 
 I.
 
 2
 The plaintiffs brought this class action on behalf of "all those present or future Cherokee Indians who practice the traditional Cherokee religion and adhere to Cherokee Indian tradition and culture." The principal relief sought in the complaint was an injunction to prevent completion and flooding of the Tellico Dam on the Little Tennessee River in Monroe County, Tennessee. The complaint alleged that the impoundment created by the dam will cause irreparable injury to the plaintiffs. This injury will be caused by flooding of the "sacred homeland" of the plaintiffs along the river, which will result in destruction of "sacred sites, medicine gathering sites, holy places and cemeteries, (and) will disturb the sacred balance of the land . . . ." It was further stated that the threatened actions of the defendant would cause "irreversible loss to the culture and history of the plaintiffs."
 
 
 3
 The claim of a constitutional violation based on the Free Exercise Clause was stated as follows:
 
 
 4
 . . . the individual named Plaintiffs will suffer injury by the infringement of their right to worship the religion of their choice in the manner of their choosing by the destruction of sites which they hold in reverence and in denial of access to such sites by the Defendant. This injury will also be suffered by other members of the class which these individual Plaintiffs represent.
 
 
 5
 The complaint also contained claims based upon other provisions of the First Amendment, the Fifth and Ninth Amendments, the American Indian Religious Freedom Act, 42 U.S.C. § 1996, the National Historic Preservation Act, 16 U.S.C. § 470 et seq. and various laws of the State of Tennessee.
 
 
 6
 The plaintiffs filed some 25 affidavits with the complaint in support of their motion for a preliminary injunction. The defendant filed a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), Fed.R.Civ.P., together with an alternative motion for summary judgment pursuant to Rule 56. This motion was accompanied by three affidavits. In a brief in support of its motion for summary judgment, the defendant asserted that the plaintiffs were estopped to make their claim and were barred by laches. In their response, the plaintiffs argued that there were genuine issues of material fact, particularly with respect to the defense of laches, and that this was not a proper case for summary judgment.
 
 
 7
 All issues were fully briefed and the district court heard extensive oral arguments. Thereafter the court filed a memorandum opinion and entered an order denying the plaintiffs' motion for injunction and granting the defendant's motion to dismiss. In its memorandum, the district court concentrated on the religious freedom arguments and quickly disposed of the other constitutional claims and those based on statutes. At the outset the district court stated, "The Court assumes that the land to be flooded is considered sacred to the Cherokee religion and that active practitioners of that religion would want to make pilgrimages to this land as a precept of their religion." The court found that the only "coercive effect" of the impoundment on the plaintiffs' religious beliefs or practices would consist of preventing access to certain land owned by the government. The district court then held, "the free exercise clause is not a license in itself to enter property, government-owned or otherwise, to which religious practitioners have no other legal right or access." The court stated specifically that it did not reach the defenses of estoppel and laches. Sequoyah v. TVA, 480 F.Supp. 608 (E.D.Tenn.1979).
 
 II.
 
 8
 Though the district court granted the motion to dismiss, it is clear from the transcript and from his memorandum that Judge Taylor considered the various affidavits which were in the record. Under Rule 12(b) when matters outside the pleadings are presented to the court, and not excluded, a motion to dismiss for failure to state a claim is treated as one for summary judgment. We treat the decision of the district court as one granting summary judgment. See Compania De Remorque Y. Salvamento, S. A. v. Esperance, Inc., 187 F.2d 114 (2d Cir. 1951). In reviewing summary judgment for the defendant this court must view the entire record in the light most favorable to the plaintiffs. Aetna Insurance Co. v. Loveland Gas & Electric Co., 369 F.2d 648 (6th Cir. 1966); Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425 (6th Cir. 1962).
 
 A.
 
 9
 We agree with the holding of the district court that the defendant was entitled to judgment on the plaintiffs' claim of violation of their right to freedom of speech and association, to due process and equal protection of the law, and rights reserved to them by the Ninth Amendment. Accepting all the pleadings and affidavits as true, no claim for relief was stated with respect to these theories and the defendant was entitled to judgment as a matter of law. Relief under the American Indian Religious Freedom Act, the National Historic Preservation Act and laws of Tennessee is foreclosed by a provision of the Energy and Water Development Appropriation Bill, Pub. Law No. 96-69, signed by President Carter on September 25, 1979: "(N)otwithstanding provisions of 16 U.S.C., Chapter 35 (The Endangered Species Act) or any other law, the Corporation (TVA) is authorized and directed to complete construction, operate and maintain the Tellico Dam. . . ." (italics supplied). No clearer congressional command is imaginable. No law is to stand in the way of the completion and operation of the dam. The only basis upon which the district court or this court would be empowered to enter an order contrary to the express will of Congress is that a violation of the Constitution will result from carrying out the congressional mandate.
 
 B.
 
 10
 Before analyzing the complaint and affidavits of the plaintiffs we note that the Tellico Dam has engendered controversy and litigation from the time it was first proposed. A brief description of the Little Tennessee River, the historical significance of the region and the litigation spawned by Tellico is contained in the opening paragraphs of the Supreme Court's opinion in the "snail darter" case, TVA v. Hill, 437 U.S. 153, 156-59, 98 S.Ct. 2279, 2282-84, 57 L.Ed.2d 117 (1978).
 
 
 11
 The record in the present case discloses that some of the plaintiffs objected to the dam and sought to prevent its construction as early as 1965. However, the documents in the record indicate that the Cherokee objections to the Tellico Dam were based primarily on a fear that their cultural heritage, rather than their religious rights, would be affected by flooding the Little Tennessee Valley. Only with the filing of the complaint in this action, on October 12, 1979 less than a month before impoundment was scheduled to begin did any Cherokee make an explicit claim based on the Free Exercise Clause.
 
 C.
 
 12
 The allegations of the complaint which relate to free exercise of religion have been set forth, ante. Examination of the contents of the affidavits filed by the plaintiffs discloses the following:
 
 
 13
 (1) The plaintiff Ammoneta Sequoyah is a medicine man and a direct descendant of Sequoyah, the inventor of the Cherokee writing system. This affiant stated that he had gone to the Valley all his life and had lived in an abandoned cabin at Chota* for six years. His ancestor Sequoyah was born at Tuskegee, another of the Cherokee village sites in the Valley. The affiant stated that he goes to the Valley three or four times a year to get medicine which must be gathered by a medicine man "to work a cure." The Cherokees believe that all a person knows is placed in the ground with that person when he is buried. Flooding the Valley or digging up the bodies of Indians buried there will destroy "the knowledge and beliefs of (the) people who are in the ground" and destroy what they have taught. Mr. Sequoyah believes he will lose his knowledge of medicine if the Valley is flooded.
 
 
 14
 (2) Richard Crowe had been going to the lands at Tellico for more than 30 years and learned from his people that "This is where WE begun." Over the years Mr. Crowe has visited the area more than 20 times, and he took his children there when they were young. Chota is one of the sacred Cherokee places, spoken of by his family as the birthplace of the Cherokee. It was understood by the Cherokees that "this location was our connection with the Great Spirit."
 
 
 15
 (3) Lloyd Sequoyah, brother of the plaintiff Ammoneta Sequoyah, is also a medicine man. He stated in his affidavit that he had visited the Valley "on two occasions," and that the only place that he can find his medicine is where the Cherokee forefathers lived. It was his belief that "If these lands are flooded they will destroy the spiritual strength of the Cherokee people."
 
 
 16
 (4) Robert Blankenship stated, "Chota, and the Little Tennessee River . . . are sacred because they are the only two tangible items left for me and other Cherokee people to worship."
 
 
 17
 (5) A number of other affidavits described the land in the Little Tennessee Valley as sacred and holy to Cherokees and stated that burial sites should not be disturbed.
 
 
 18
 (6) Several affidavits were filed by anthropologists who specialize in American Indian studies. These affidavits affirmed the importance of particular places in Cherokee tradition and religion. They also testified to the importance of living in harmony with nature and the belief that interference with natural objects, such as damming rivers, is wrong. All also testified to the importance of prophecies to traditional Cherokees, and stated that many of their prophecies rest on oral history of earlier events in the "Old Country" of North Carolina, Georgia and Tennessee.
 
 D.
 
 19
 The Cherokees who are plaintiffs in this action obviously have great reverence for their ancestors and believe that the places where their ancestors lived, gathered medicines, died and were buried have cultural and religious significance. Similar feelings are shared by most people to a greater or lesser extent. However, because of their beliefs respecting the transmission of knowledge and spiritual powers to succeeding generations, particular geographic locations figure more prominently in Indian religion and culture than in those of most other people.
 
 III.
 
 20
 There is no requirement that a religion meet any organizational or doctrinal test in order to qualify for First Amendment protection. Orthodoxy is not an issue. The fact that Cherokees have no written creeds and no man-made houses of worship is of no importance. The Cherokees have a religion within the meaning of the Constitution and the sincerity of the adherence of individual plaintiffs to that religion is not questioned. However, in bringing this action, the plaintiffs are asserting that otherwise lawful and wholly secular activity of the government should be prohibited. Accepting every statement of fact as true, the question is whether the plaintiffs have shown a constitutionally cognizable infringement of a First Amendment right.
 
 
 21
 It is the flooding of a particular place which is claimed to deny the right freely to exercise the plaintiffs' religion. It is clear, even from the plaintiffs' affidavits, that the exact location of Chota and the other village sites was unknown to the Cherokees until TVA undertook archeological explorations with the assistance of the University of Tennessee. It appears that the plaintiffs are now claiming that the entire Valley is sacred. Yet none of the affidavits stated this explicitly. For more than 100 years prior to its acquisition by TVA the land in the Valley was owned by persons other than the plaintiffs or members of the class. There is no showing that any Cherokees other than Ammoneta Sequoyah and Richard Crowe ever went to the area for religious purposes during that time. At most, plaintiffs showed that a few Cherokees had made expeditions to the area, prompted for the most part by an understandable desire to learn more about their cultural heritage.
 
 IV.
 
 22
 Two recent Supreme Court cases establish a two-step analysis in which courts should engage when deciding a Free Exercise claim. First, it must be determined whether the governmental action does in fact create a burden on the exercise of the plaintiffs' religion. If a burden is found it must be balanced against the governmental interest, with the government being required to show an overriding or compelling reason for its action. See Sherbert v. Verner, 374 U.S. 398, 402-03, 83 S.Ct. 1790, 1792-93, 10 L.Ed.2d 965 (1963); Wisconsin v. Yoder, 406 U.S. 205, 214-15, 92 S.Ct. 1526, 1532-33, 32 L.Ed.2d 15 (1972). The first step in this analysis is described in Yoder as evaluating the "quality of the claims" alleged to be religious. 406 U.S. at 215, 92 S.Ct. at 1533.
 
 
 23
 Many of the reported decisions concerning Indian religious claims offer little help because they arose in entirely different factual contexts from that of the present case.[2] In the one reported case which is similar to the present one, individual Navajo Indians and three Navajo "Chapters" claimed that the waters of Lake Powell encroached upon their ancestral worship site within the Rainbow Bridge National Monument in Utah. The district court granted summary judgment for the government defendants on two grounds: (1) the fact that the plaintiffs had no property interest in the Monument was held to deprive them of a cognizable First Amendment claim; (2) if the plaintiffs were found to have a cognizable claim, when the opposing interests were balanced those of the defendants were found to outweigh those of the plaintiffs. Badoni v. Higginson, 455 F.Supp. 641 (D.C.Utah 1977), appeal pending, No. 78-1517 (10th Cir.).
 
 
 24
 The district court in the present case based its holding on the plaintiffs' lack of any property interest in the Tellico area. 480 F.Supp. at 612. While this is a factor to be considered, we feel it should not be conclusive in view of the history of the Cherokee expulsion from Southern Appalachia followed by the "Trail of Tears" to Oklahoma and the unique nature of the plaintiffs' religion. Nevertheless, there are criteria by which the constitutional validity of a claim based on the Free Exercise Clause must be tested. In Wisconsin v. Yoder, supra, the Supreme Court found that the religious faith and the mode of life of the Amish are "inseparable and interdependent," and that "the traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." 406 U.S. at 215-16, 92 S.Ct. at 1533. In Frank v. Alaska, 604 P.2d 1068 (Alaska 1979), the Supreme Court of Alaska reversed the conviction of an Athabascan Indian who had been found guilty of violating game laws when he killed a moose for a funeral feast, or potlatch. The court found that "(t)he funeral potlatch is the most important institution in Athabascan life" and that "(f)ood is the cornerstone of the ritual." 604 P.2d at 1071. "While moose itself is not sacred, it is needed for proper observance of a sacred ritual which must take place soon after death occurs. Moose is the centerpiece of the most important ritual in Athabascan life and is the equivalent of sacred symbols in other religions." Id. at 1073 (footnotes deleted). In People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964), the hallucinogenic drug peyote was found to play a central role in the ceremony and practice of the Native American Church, an organization of American Indians. The "meeting" ceremony, involving the use of peyote, was found to comprise the cornerstone of the religion. Peyote was found to be more than a sacrament; it was itself an object of worship. "(P) rohibition of the use of peyote results in a virtual inhibition of the practice of defendants' religion. To forbid the use of peyote is to remove the theological heart of Peyotism." 40 Cal.Rptr. at 73-74, 394 P.2d at 817-18.
 
 
 25
 Examination of the plaintiffs' affidavits discloses no such claim of centrality or indispensability of the Little Tennessee Valley to Cherokee religious observances. Granting as we do that the individual plaintiffs sincerely adhere to a religion which honors ancestors and draws its spiritual strength from feelings of kinship with nature, they have fallen short of demonstrating that worship at the particular geographic location in question is inseparable from the way of life (Yoder ), the cornerstone of their religious observance (Frank ), or plays the central role in their religious ceremonies and practices (Woody ). Rather, the affidavits disclose that medicines are obtainable there which may be found at higher elevations in other locations, that it is believed by some that the knowledge of previous generations will be lost if graves are disturbed or flooded and that the locations of Chota and other village sites are sacred places. These affidavits appear to demonstrate "personal preference" rather than convictions "shared by an organized group." Yoder, supra, 406 U.S. at 216, 92 S.Ct. at 1533. When the affidavits are "indulgently treated," Bohn Aluminum & Brass Corp. v. Storm King Corp., supra, 303 F.2d at 427, at most they establish a feeling by the individual affiants that the general location of the dam and impoundment has a religious significance which will be destroyed by the flooding. The claim of centrality of the Valley to the practice of the traditional Cherokee religion, as required by Yoder, Woody and Frank, is missing from this case. The overwhelming concern of the affiants appears to be related to the historical beginnings of the Cherokees and their cultural development. It is damage to tribal and family folklore and traditions, more than particular religious observances, which appears to be at stake. The complaint asserts an "irreversible loss to the culture and history of the plaintiffs." Though cultural history and tradition are vitally important to any group of people, these are not interests protected by the Free Exercise Clause of the First Amendment.
 
 
 26
 It is a difficult and sensitive determination. However, we have looked at "the quality of the claims," as required by Yoder, supra, 406 U.S. at 215, 92 S.Ct. at 1533, and conclude that plaintiffs have not alleged infringement of a constitutionally cognizable First Amendment right. In the absence of such an infringement, there is no need to balance the opposing interest of the parties or to determine whether the government's interest in proceeding with its plans for the Tellico Dam is "compelling."
 
 V.
 
 27
 The plaintiffs have urged this court to remand to the district court for a trial. However, at the hearing on the motions the district court particularly asked what issues would require a trial, given the affidavits filed by the parties. Counsel for the plaintiffs emphasized the need for further proof in order for the district court to pass on the defense of laches and estoppel and in balancing the competing claims, assuming a finding of infringement. Neither the district court nor this court found it necessary to reach these issues. No argument was made that further proof was required to establish the required quality of the claims. When asked at oral argument in this court, counsel for the plaintiffs was unable to state what further proof was required. It is our conclusion, for the reasons set forth, that the defendant was entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. Nor is it necessary to remand because we have decided the case for reasons somewhat different from those stated by the district court. The grounds of our decision are supported by the record and the parties have fully briefed and argued these grounds. See Paskaly v. Seale, 506 F.2d 1209 (9th Cir. 1974).
 
 
 28
 The judgment of the district court is affirmed. No costs allowed on appeal.
 
 
 29
 MERRITT, Circuit Judge, dissenting.
 
 
 30
 I agree with the centrality standard and the general reasoning of the Court's opinion, but I believe the case should be remanded to the District Court to permit plaintiffs to offer proof concerning the centrality of their ancestral burial grounds to their religion.
 
 
 31
 This is a confusing and essentially uncharted area of law under the free exercise clause. At the time the complaint and various affidavits were filed, the centrality standard had not been clearly articulated. It may have been unclear to the Cherokees precisely what they had to allege and prove in order to make a constitutional claim. Indeed, the District Court simply held that the Indians have no free exercise claim because the Government now owns the land on which the burial sites are located. The District Court therefore did not explore, develop or find any facts concerning the role that this particular location plays in the Cherokee religion. In view of the liberal rules of pleading and the protective attitude that federal courts should follow in considering Indian claims,[1] we should reverse and remand the case to the District Court in order to give the Cherokees an opportunity to offer proof concerning the significance and centrality of their ancestral burial grounds in light of the standard we have adopted.
 
 
 
 [1]
 "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . .."
 
 
 *
 Chota was one of the nine sites of 18th Century Cherokee villages located in the Valley. Chota was perhaps the most important of these; it was both the capital of the Cherokee Nation and a "peace town" or sanctuary
 
 
 [2]
 Typically they concern some official regulation of individual activity which infringes the right of a particular group or person to the free exercise of religion. E. g., Teterud v. Burns, 522 F.2d 357 (8th Cir. 1975) (prison regulation against long, braided hair)
 
 
 [1]
 See, e. g., United States v. Jackson, 280 U.S. 183, 190, 50 S.Ct. 143, 145, 74 L.Ed. 361 (1930); United States v. Nice, 241 U.S. 591, 597, 36 S.Ct. 696, 697, 60 L.Ed. 1192 (1916); United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886)