UNITED STATES of America, Plaintiff,

v.

James E. BILLIE, Defendant.

No. 87–8038–Cr–Paine.

United States District Court, S.D. Florida.

Aug. 24, 1987.

---

F. Henry Habicht, II, Asst. Atty. Gen.,
and Donald A. Carr, James C. Kilbourne,

and Charles W. Brooks, Attys., U.S. Dept. of Justice, Washington, D.C., for U.S.

Bruce Rogow, Fort Lauderdale, Fla., and Michael L. Kobiolka, Davie, Fla., for defendant.

## MEMORANDUM AND ORDER ON MOTIONS TO DISMISS

PAINE, District Judge.

This cause came before the court on defendant's motion to dismiss based upon the invalidity of the Endangered Species Act as applied to acts without a commercial purpose on the Seminole Indian Reservation (DE 20), the Government's response (DE 27), and defendant's reply (DE 34). Also before the court was defendant's "omnibus" motion to dismiss (DE 19), the Government's response (DE 28), and defendant's reply (DE 35). By this motion the defendant asks the court to determine the requisite mens rea to sustain a conviction and argues that (1) the Government has selectively prosecuted him on the basis of national origin and has "failed to use the least restrictive means" of accomplishing its goal of protecting endangered species, (2) the information must be dismissed for multiplicity, and (3) the possession count of the information violates his right to freedom of religion under the First Amendment.

The court held a hearing on August 13, 1987 and received evidence on the motions to dismiss based on First Amendment and selective prosecution grounds (DE 19). The court denied the selective prosecution motion at the hearing, finding that defendant had not carried his burden of proof.[1] On August 14, the court issued an order (DE 42) denying the remaining motions to dismiss (DE 19, 20) and stating that the court would set forth its reasons in a separate order to be entered forthwith. In accordance with that promise, and having considered the submissions of the parties, the testimony of the witnesses, and the items received in evidence as well as the pertinent authorities, the court renders the following memorandum and order.

## I. BACKGROUND

On April 14, 1987, James Billie was charged in a two count information with the taking and subsequent possession, carrying, and transportation of a Florida panther, in violation of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* (1982) (the Act); *see id.* §§ 1538(a)(1)(B), 1538(a)(1)(D), 1540(b)(1). The *felis concolor coryi* or Florida panther is a particular subspecies of panther listed as "endangered" pursuant to the Act. The defendant is a member and chairman of the Seminole Indian Tribe, which has approximately 1,700 enrolled members. All of the acts complained of in the information were committed in December 1983 on the Big Cypress Seminole Indian Reservation in the Southern District of Florida (DE 1, 12).

## II. APPLICABILITY OF ENDANGERED SPECIES ACT TO SEMINOLE INDIAN RESERVATIONS

Billie first moves to dismiss the information on the ground the Act does not apply to non-commercial hunting on the Seminole Indian Reservations (DE 20). He argues that the Act evinces no Congressional intent to abrogate or modify his traditional right to hunt and fish on the reservation. The Government disagrees, maintaining that the Act is a reasonable, necessary, and nondiscriminatory conservation statute which has limited Indian rights to take or possess species to the extent those rights are inconsistent with the Act. In *United States v. Dion*, 476 U.S. 734, 106 S.Ct. 2216, 2223, 90 L.Ed.2d 767 (1986), the Supreme Court expressly left unresolved the question whether the Act abrogates Indian hunting rights. Although the Eighth Circuit's en banc opinion in *Dion* held that the Act did not apply to Indians exercising non-commercial hunting rights on Indian land, *see United States v. Dion*, 752 F.2d

---

1. At the hearing, the court also denied defendant's motion to suppress the Florida panther hide and skull, which were seized after a warrantless search. The court held that the defendant had no reasonable expectation of privacy in the part of his chickee compound on the Big Cypress Indian Reservation where the evidence was located.

1261, 1270 (8th Cir.1985) (en banc), *rev'd on other grounds*, 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986), that decision is not binding on this court. Accordingly, Billie's motion to dismiss presents a question of first impression in the Eleventh Circuit.

### A. The Endangered Species Act

The Supreme Court has described the Endangered Species Act as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). The Act empowers the Secretary of the Interior (the Secretary) to list species as either "endangered" or "threatened" based on any of the following factors: present or threatened destruction of a species' habitat or range; its overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other factors affecting its continued existence. 16 U.S.C. § 1533(a)(1). An endangered species is one "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The Florida panther, whose historic range is listed as in the United States from Louisiana and Arizona east to South Carolina and Florida, has been listed as endangered since 1967. 50 C.F.R. § 17.11 (1986).

The Act's prohibitions are set forth in 16 U.S.C. § 1538. Included within these prohibitions are the taking of any endangered species within the United States, the possession of any illegally taken endangered species, and the sale or offer for sale of any endangered species in interstate or foreign commerce. Civil and criminal penalties may be imposed for violations of the Act. *Id.* § 1540.

Congress has drawn several extraordinarily narrow exceptions to the Act's prohibitions. Indians, Aleuts, or Eskimos who are Alaskan Natives residing in Alaska and, in some circumstances other non-native permanent residents of Alaskan native villages, may take endangered or threatened species, but only if the taking is primarily for subsistence purposes and only subject to such regulations as the Secretary may issue upon his determination that such takings materially and negatively affect the species. *Id.* § 1539(e). In addition, the Secretary may permit otherwise prohibited acts for scientific purposes, to enhance the propagation or survival of the affected species, or when the taking is incidental to carrying out an otherwise lawful activity. Such permits may be issued only on the basis of stringent statutory procedures designed to assure that any adverse impact on the particular species will be minimized. *Id.* § 1539(a).

### B. Hunting Rights on the Seminole Indian Reservations

The Seminole Indian Reservations were established pursuant to an Executive Order by which certain lands were "set aside as a reservation for the Seminole Indians in southern Florida." Executive Order No. 1379 (June 28, 1911), *reprinted in* 3 C. Kappler, *Indian Affairs: Laws and Treaties* 678–79 (1913).[2] Although the Executive Order does not expressly mention hunting and fishing rights, those rights were included by implication in the setting aside of the lands as an Indian reservation. *See Dion*, 106 S.Ct. at 2219 ("As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress"); *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 405–06, 88 S.Ct. 1705, 1707–08, 20 L.Ed.2d 697 (1968) (rights to hunt and fish implied from treaty

---

**2.** During the nineteenth century, the United States entered into numerous treaties with the Seminoles in attempts to end the Seminole Indian Wars, to convince the Seminoles to settle west of the Mississippi, and to settle land disputes between the Seminole and other tribes that did move west. *See, e.g.,* Treaty with the Seminole (May 9, 1832), 7 Stat. 368; Treaty with

the Seminole (March 28, 1833), 7 Stat. 423; Treaty with the Creeks and Seminole (January 4, 1845), 9 Stat. 821; Treaty with the Creeks, etc. (August 7, 1856), 11 Stat. 699. Not all Seminoles moved west, however. In 1911, President Taft signed an Executive Order No. 1379, creating a reservation for those Seminoles remaining in Florida.

clause giving lands to Indians "to be held as Indian lands are held" ); *see also Arizona v. California,* 373 U.S. 546, 598, 83 S.Ct. 1468, 1497, 10 L.Ed.2d 542 (1963) (establishment of reservation reserves water rights to Indians, whether reservation established by treaty or executive order). The Seminoles' rights to hunt and fish are part of their larger rights of possession. *See United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905); *see also Menominee Tribe,* 391 U.S. at 406 & n. 2, 88 S.Ct. at 1707 n. 2, F. Cohen, *Handbook of Federal Indian Law* 441–42 (R. Strickland ed. 1982).

▪ Although the Congress is empowered to abrogate Indian rights, its intent to do so must be clear and plain. In *Dion* the Supreme Court discussed the different standards it has employed over the years for determining how such an intent must be demonstrated. *See Dion,* 106 S.Ct. at 2220. An explicit statement by Congress is preferable but not required:

> Where the evidence of congressional intent to abrogate is sufficiently compelling, "the weight of authority indicates that such an intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute." Cohen [, *Handbook of Federal Indian Law,* at] 223. What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.

*Id.* Billie maintains that the Act and its legislative history lack the evidence of congressional intent necessary to abrogate his hunting rights.

### C. *The Scope of the Right*

▪ Before the court can determine whether the Seminoles' rights have been abrogated, however, it must assess the scope of those rights. As a general rule, treaties with the Indians should be interpreted as the Indians themselves would have understood them. *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 631, 90 S.Ct.

1328, 1334, 25 L.Ed.2d 615 (1970); *Tulee v. Washington,* 315 U.S. 681, 684–85, 62 S.Ct. 862, 864–65, 86 L.Ed. 1115 (1942). The Supreme Court has stated that Indian treaties "cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted them." *Oliphant v. Squamish Indian Tribe,* 435 U.S. 191, 206, 98 S.Ct. 1011, 1019, 55 L.Ed.2d 209 (1978).

When the Seminole reservations were set aside in 1911, the Florida pather was not endangered. The court has received no evidence showing that in 1911 either the Seminoles or the United States imagined that the Florida panther would be nearly extinct in 1987. Given this historical setting, and as the Government aptly points out in its memorandum, it is inconceivable that the Seminoles would have demanded, and the United States would have conceded, a right to hunt on the lands in question free from regulation by the federal sovereign. *See New York ex rel. Kennedy v. Becker,* 241 U.S. 556, 563, 36 S.Ct. 705, 707, 60 L.Ed. 1166 (1916).

The Supreme Court has confirmed that Indian treaty rights do not extend to the point of extinction. *See Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (*Puyallup III*); *Department of Game v. Puyallup Tribe,* 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) *Puyallup II; Puyallup Tribe v. Department of Game,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). The Court has noted:

> We do not imply that these fishing rights persist down to the very last steelhead in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.

*Puyallup II,* 414 U.S. at 49, 94 S.Ct. at 333. The Court has also indicated that on-reservation fishing rights derived from a treaty are not absolute. *See Puyallup III,* 433 U.S. at 176, 97 S.Ct. at 2623 ("it would be decidedly unwise, if Puyallup treaty fishermen were allowed untrammeled on-reservation fishing rights"); *see also Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 684–87, 99 S.Ct. 3055, 3073–74, 61 L.Ed.2d 823 (1979). The *Puyallup* decisions were based in part upon the state's "interest in conserving a scarce, common resource." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 332 n. 15, 103 S.Ct. 2378, 2385 n. 5, 76 L.Ed.2d 611 (1983).

Pertinent in this regard is the recent opinion of the Tenth Circuit in *Northern Arapahoe Tribe v. Hodel,* 808 F.2d 741 (10th Cir.1987). In that case, two Indian tribes who jointly cohabited a reservation in Wyoming had traditionally adopted their own game code without federal interference. After the tribes failed to agree on a game code over several hunting seasons, the Shoshone Tribe complained to the Bureau of Indian Affairs (BIA) that some species of big game were in risk of endangerment or extinction and asked it to impose an interim game code. The BIA complied. The Arapahoe sought to preliminarily enjoin implementation of the game code, arguing in part that the Secretary lacked authority to regulate hunting on the reservation. The Court of Appeals disagreed, holding held that the Government's obligation to protect the Shoshone's resources supported the Secretary's authority to establish an interim game code when there existed a risk of extinction or endangerment of the wildlife and when the tribes failed to enact their own game code. The court noted that "[t]he right to hunt on the reservation is held in common by both tribes, and one tribe cannot claim that right to a point of endangering the resource in derogation of the other tribe's rights." *Id.* at 750.

■ Although *Northern Arapahoe* presented facts different from the case before this court, together with the other authorities discussed, it illustrates that Indian rights to hunt and fish are not absolute. Where conservation measures are necessary to protect endangered wildlife, the Government can intervene on behalf of other federal interests. The migratory nature of the Florida panther gives Indians, the states, and the federal Government a common interest in the preservation of the species. Where the actions of one group can frustrate the others' efforts at conservation, *see Puyallup III,* 433 U.S. at 176, 97 S.Ct. at 2623, reasonable, nondiscriminatory measure may be required to ensure the species' continued existence. *See Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920); *Kennedy,* 241 U.S. at 563, 36 S.Ct. at 707.

The Endangered Species Act is such a measure. Its general comprehensiveness, its nonexclusion of Indians, and the limited exceptions for certain Alaskan natives, *see supra* pt. II(A), demonstrate that Congress considered Indian interests, balanced them against conservation needs, and defined the extent to which Indians would be permitted to take protected wildlife.

The Act's legislative history provides additional evidence that Congress intended to subject Indians to its prohibitions. In 1972, Congress considered but did not pass two companion bills (H.R. 13081, 92d Cong., 2d Sess.; S. 3199, 92d Cong., 2d Sess.) that closely paralleled the bill enacted in 1973 which became the Act. Those unpassed bills contained broader exemptions encompassing the taking of protected species for Indian religious purposes pursuant to a treaty, executive order, or statute. In the Senate subcommittee hearings on S. 3199, an Interior Department official objected to the deletion in S. 3818 of the "exception for consumption and ritual use by American Indians, Aleuts or Eskimos." He urged the subcommittee to "adopt language as found in Section 5(a)(2) of S. 3199," because the Department supported "such taking for cultural and survival use when the Secretary determines, in each case, that such taking will not lead to extinction or otherwise irreparably damage population stocks." *Endangered Species Conservation Act of 1972: Hearings on S. 249, S.*

*3199, and S. 3818 before the Subcomm. on the Environment of the Senate Comm. on Commerce*, 92d Cong., 2d Sess. 66, 71 (1972). The subcommittee did not comply with this request.

In the House hearings on H.R. 13081, a subcommittee member asked for a list of the species which might be endangered on Indian lands on the American continent. The Florida panther was on that list. Addressing the question of the constitutionality of a provision which would extinguish Indian treaty rights to hunt and fish, Interior Department officials spoke only of Alaskan natives. Referring to all Indians, the official also noted:

> Statements made by the Committee indicate its desire to prohibit American Indians from continuing such hunting or fishing, exemplifying a concern for the perile [sic] of our endangered species and the presumed inconsistency therewith in permitting American Indians to perhaps extinguish a species in the name of treaty rights.

*Predatory Mammals and Endangered Species: Hearings Before the Subcomm. on Fisheries and Wildlife Conservation of the Comm. on Merchant Marine and Fisheries*, 92d Cong., 2d Sess. 144 (1972) [hereinafter cited as "Predatory Mammals"]. The official that suggested that, if Congress wanted to eliminate Indian treaty rights, it should do so "expressly, for the treaty-secured rights in question as well as those secured to American Indians by Executive Order or Federal Statute, will nonetheless be preserved to them by the law if Congress simply deletes Section 5(a)(2)." *Id.* Congress did not follow or disregard this legislation drafting advice because H.R. 13081 was not pursued further after the Ninety-Second Congress adjourned.

Although Billie has not raised the argument, the court has considered whether this excerpt might be evidence that Congress believed it would not extinguish non-Alaskan Indian hunting and fishing rights without an express provision and that the lack of such a provision evinces congressional intent not to abrogate those rights.

H.R. 13081, however, was not the bill that eventually was passed. As the court has noted, *see supra* pt. II(A), the actual bill contains an express exemption for Alaskan natives which is much narrower than the exceptions for cultural and subsistence taking in section 5(a)(2) of H.R. 13081 and in S. 3199. The Senate committee report to the Act emphasized that the special exception for Alaskan natives "remains subject to the discretion of the Secretary under the terms and conditions set forth in the Act, who may revoke or regulate the exemption on the taking of endangered or threatened fish or wildlife with reference to species, isolated populations, season for taking, or geographical location." S.Rep. No. 307, 93d Cong., 1st Sess. 300, 304 (1973), 1973 U.S.Code Cong. & Admin.News 2989, 2993. Given the evidence of the committee's desire to prohibit American Indians from continuing hunting and fishing of endangered or threatened species, *see Predatory Mammals*, the court believes that Congress would have also circumscribed non-Alaskan Indians' rights had it intended to preserve them. Further, the Interior Department advised in connection with H.R. 13081 that treaty rights would be preserved if the Alaskan exemption were stricken. In the bill that was passed, it was not. From this evidence, the court infers that Congress must have known that the limited Alaskan exemption would be interpreted to show congressional intent not to exempt other Indians.

■ The legislative history must be considered along with the plain language of the Act. The narrow Alaskan exception, the inclusion of Indians within the Act's definition of "person," the Act's general comprehensiveness, and the evidence that the House committee desired to prohibit Indians from hunting and fishing protected species all provide "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogat-

ing" the Indian rights. *Dion*, 106 S.Ct. at 2220.[3]

In summary, this court's conclusion that the Endangered Species Act applies to hunting by Indians on the Seminole reservations is based on both the character of their hunting rights and on the Act's abrogation of those rights. On-reservation hunting rights are not absolute when a species such as the Florida panther is in danger of extinction. To the extent that evidence of congressional abrogation of these rights is required, that standard has been met. When Congress passed "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tennessee Valley Authority*, 437 U.S. at 180, 98 S.Ct. at 2294, and empowered the Secretary of the Interior to classify a species as "in danger of extinction," 16 U.S.C. § 1532(6), it could not have intended that the Indians would have the unfettered right to kill the last handful of Florida panthers. Accordingly, Billie's motion to dismiss (DE 20) is denied.

### III. MENS REA

The court next addresses defendant's motion to determine the state of mind required for criminal violations of the Act (DE 19). The provisions under which the defendant is charged provide for criminal penalties when the taking or possession of the protected species is committed "knowingly." 16 U.S.C. § 1540(b)(1). Billie argues that, in order to convict, the Government must prove beyond a reasonable doubt his knowledge that (1) the animal he shot was a Florida panther, and (2) it was a crime to do so on the Seminole Indian Reservations. Because the Government concedes that it could prove only general intent, a holding that specific intent is necessary would result in dismissal of the information.

#### A. *Knowledge of the Subspecies*

Billie acknowledges that the Government need not prove he knew at the time of the shooting that the animal was listed as endangered but argues that it must prove beyond a reasonable doubt that he knew the panther was a *felis concolor coryi* (DE 35), the specific subspecies of panther which is listed as endangered. The legislative history of the Act indicates that Congress did "not intend to make knowledge of the law an element" of a criminal violation, H.R.Rep. No. 95–1625, 95th Cong., 2d Sess. 26, *reprinted in* 1978 U.S. Code Cong. & Admin.News 9453, 9476. Notwithstanding, Billie contends that Congress must have meant something when it used the word "knowingly."

■ The court finds the defendant's argument to be without support in law or reason. In general, the word "knowingly" means "that the act was done voluntarily and intentionally and not because of mistake or accident." This is the definition provided in the Pattern Jury Instructions for criminal cases which is distributed by the District Judges Association of the Eleventh Circuit. Such a definition comports with the general rule that criminal penalties attached to regulatory statutes intended to protect public health, safety, or welfare should be construed to effectuate their regulatory purpose. *See United States v. Johnson & Towers, Inc.*, 741 F.2d 662, 666 (3d Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985). The Act is a regulatory statute, enacted to conserve and protect endangered species. *See* 16 U.S.C. § 1531(a), (b); *Tennessee Valley Authority*, 437 U.S. 153, 98 S.Ct. 2279 (plain intent of Congress in enacting Act was to halt and reverse trend towards species extinction, whatever the cost); *cf. United States v. Engler*, 806 F.2d 425, 432 (3d Cir.1986) (Migratory Bird Treaty Act is public welfare regulatory measure). In the

---

**3.** Although the Eighth Circuit reached a contrary conclusion in its consideration of the *Dion* case, it applied the "express reference" test established in its prior decision in *United States v. White*, 508 F.2d 453 (8th Cir.1974). The en banc court held that, in cases involving criminal violations of the Endangered Species Act, statutory abrogation or treaty rights could be accomplished only by an express reference to treaty rights in the statute or its legislative history. *Dion*, 752 F.2d at 1265–67. The Supreme Court's subsequent opinion in *Dion*, however, establishes that such an exacting standard is unnecessary. *See Dion*, 106 S.Ct. at 2220.

court's view, the construction advanced by defendant would eviscerate the Act's purpose because it would be nearly impossible to prove that the average hunter recognized the particular subspecies protected under the Act. Accordingly, the Government need prove only that the defendant acted with general intent[4] when he shot the animal in question.

### B. *Knowledge of the Act's Applicability*

Billie further argues that he could not have had the requisite mens rea to violate the Act because its applicability to on-reservation hunting by Indians was vague or highly debatable. As the court has noted, in *Dion*, 752 F.2d 1261, the Eighth Circuit held that the Act did not apply to Indians exercising non-commercial hunting rights on Indian land. In reviewing that decision, the Supreme Court specifically declined to pass upon the question whether the Act applies on Indian reservations. *See Dion*, 106 S.Ct. at 2223. Billie cites *United States v. Critzer*, 498 F.2d 1160 (4th Cir. 1974), in which an Indian's conviction for tax evasion was reversed because the court concluded the defendant's duty to pay taxes on income derived from commercial property on Indian trust land was so "vague or highly debatable," *id.* at 1162, that she could not have had the requisite intent to violate the law. In Billie's view, the *Dion* decisions demonstrate that the Act's applicability to Indian land is so unclear that his intent to violate it could not be proved.

■ This argument might be persuasive were intent to violate the law an element of the crime. *Critzer* involved a prosecution under the income tax laws, which required a showing that the defendants "willfully" violated the law. *Id.* at 1160; *accord Unit-*ed States v. Mallas*, 762 F.2d 361, 363 (4th Cir.1985) (following *Critzer* in case involving willfull violations of tax laws). The statutes under which Billie has been charged require the Government to prove he acted not "willfully" but "knowingly." The Eleventh Circuit pattern jury instructions specifically distinguish "knowingly" from "willfully," which is defined as "voluntarily and purposely, with the specific intent to do something the law forbids." The court has held the Act to require only general intent. *See supra* pt. III(A). Specific intent to violate the law, therefore, is not an element.

Even if knowledge of a clear duty were necessary, the defendant should have been on notice that the law applied to him. The Act's prohibitions extend to "any person subject to the jurisdiction of the United States." 16 U.S.C. § 1538(a)(1). The definition of "person" in the statute does not exclude Indians. *Id.* § 1532(13). Although Billie argues that on-reservation hunting does not "subject [him] to the jurisdiction of the United States," this construction is belied by the Act. These provisions show that Congress could have exempted on-reservation hunting by non-Alaskan Indians but chose not to do so. Thus, on its face, the Act applies to Billie. *See supra* pt. II.

The *Dion* decisions, moreover, do not demonstrate such uncertainty that Billie should not be criminally prosecuted under the Act. The Eighth Circuit's en banc decision was not filed until 1985, and the shooting in this case occurred in 1983. Billie, therefore, could not have relied upon that decision when he shot the panther in question. Because the Act applies to Indian lands, *see supra* pt. II, and does not require specific intent, the Government need not prove that Billie knew the Act applied

---

4. As a general matter, "[s]pecific and general intent have been notoriously difficult terms to define and apply." *People v. Hood,* 1 Cal.3d 444, 82 Cal.Rptr. 618, 462 P.2d 370 (1969). Chief Justice Traynor of the California Supreme Court made the following distinction:

When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further. act or achieve some additional consequence, the crime is deemed to be one of specific intent. *Id.*

to his on-reservation hunting in order to convict him.[5]

## IV.  MULTIPLICITY OF INFORMATION

The information charges Billie with taking, possessing, carrying, and transporting a single *coryi*.  Count I charges the taking; Count II charges the possession, carrying, and transportation.  Billie contends that the information must be dismissed for multiplicity, which is "the charging of a single offense in more than one count." *United States v. Wood*, 780 F.2d 955, 962 (11th Cir.) (quoting *United States v. Glanton*, 707 F.2d 1238, 1240 (11th Cir.1983) (per curiam)), *cert. denied*, —— U.S. ——, 106 S.Ct. 2920, 91 L.Ed.2d 549 (1986).

"[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).  In *Blockburger* the Supreme Court held that one drug transaction gave rise to two distinct offenses, the sale of the drug not in its original package and its sale without a written order.

■ The Endangered Species Act defines the term "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The prohibition against these acts in section 1538(a)(1)(B) is set out separately from the prohibition against possessing, selling, delivering, carrying, transporting, or shipping in subsection (D).  Count I of the information requires proof of a taking, while Count II does not.  Count II requires proof that Billie possessed, carried, or transported the

panther, and such proof would not be required to convict on Count I.  The information thus passes the *Blockburger* test.  *Cf. Aiuppa v. United States*, 393 F.2d 597, 599–600 (10th Cir.1968) (separate counts charging possession and transportation of migratory birds not multiplicitous), *vacated on other grounds sub nom. Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (per curiam).  The motion to dismiss for multiplicity (DE 19) should therefore be denied.

## V.  RELIGIOUS FREEDOM

Billie last contends that the possession charge violates his right to freedom of religion under the First Amendment (DE 19).  He argues that the Act is overbroad either on its face or as applied to him because, unlike the Bald Eagle Protection Act, 16 U.S.C. § 668 *et seq.* (1982), it does not authorize the Secretary to permit the possession of the species for Indian religious purposes.  Thus, according to the defendant, the Act is invalid because it sweeps within its ambit his constitutionally-protected practices.

### A.  *Facial Overbreadth*

■ A statute is overbroad on its face if it is unconstitutional in every application or if it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.  *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984).[6] The mere fact that some impermissible applications of a statute are conceivable, however, does not render it overbroad.  According to the requirement of substantial overbreath, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court

---

5.  The court advised in its August 14 order (DE 42) that it would not instruct the jury that the state of the law regarding hunting on Indian reservations provides a defense to the charges against Billie.

6.  The Eleventh Circuit has recently stated that a challenge to a statute on First Amendment grounds requires the court first to consider whether the conduct is constitutionally protect-

ed.  If it is, the court must consider whether the statute is invalid on its face.  *See Clean-Up '84 v. Heinrich*, 759 F.2d 1511, 1513 (11th Cir.1985).  Although the court will assume for purposes of the facial overbreath analysis that Billie's conduct is constitutionally protected, it entertains doubts whether Billie met his burden of proof on this issue.  *See infra* pt. V(B).

for it to be facially challenged on overbreadth grounds." *Id.* at 800–01, 104 S.Ct. at 2126–27.

■ The Endangered Species Act represents the legislature's attempt to achieve the laudable goal of protecting this country's vulnerable wildlife. The possible constitutional applications of the Act are too numerous to conceive. The possibility that it might be unconstitutionally applied to certain religious practices does not render it void on its face where the remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct. *See Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 965, 104 S.Ct. 2839, 2851, 81 L.Ed.2d 786 (1984). Billie, therefore, must demonstrate that the Act is unconstitutional as applied to him. *See id.*

### B. *Overbreadth as Applied*

Not all burdens on religion are unconstitutional. *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 2153, 90 L.Ed.2d 735 (1986). The Free Exercise Clause "embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Every practice an actor might classify as religious is not absolutely protected from governmental regulation. *See, e.g., United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (Social Security taxes may be constitutionally imposed on persons who object on religious grounds to payment of taxes to support public insurance funds); *United States v. Middleton,* 690 F.2d 820, 824–26 (11th Cir.1982) (defendant's religious interest in marijuana use outweighed by compelling governmental interest in regulation of illegal drugs), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983).

Before the court balances competing governmental and religious interests, the governmental action must pass two threshold tests. First, the law must regulate conduct rather than belief. Second, the law must have both a secular purpose and a secular effect. *Grosz v. City of Miami Beach,* 721 F.2d 729, 733 (11th Cir.1983), *cert. denied,* 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984). The Endangered Species Act passes both of these tests. The Act regulates conduct, not belief, and is facially neutral in its application. In purpose and effect, the Act protects endangered and threatened wildlife.

The court next "faces the difficult task of balancing governmental interests against the impunged religious interest." *Grosz,* 721 F.2d at 734. In this regard, the Eleventh Circuit has articulated the "basic principle" that "the balance depends upon the cost to the Government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the Government activity." *Id.*

The stated purposes of the Act are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. 1531(b). Congress recognized that the "two major causes of extinction" are hunting and destruction of natural habitat. S.Rep. No. 93–307, 93d Cong., 1st Sess. 300, *reprinted in* 1973 U.S.Code Cong. & Admin.News 2989, 2990. In its judgment, the need for strong endangered species efforts was more than aesthetic. It found that many species facing extinction "perform vital biological services to maintain a balance of nature within their environments" and that biological diversity among species was essential for scientific purposes. *Id.*

The Florida panther was one of the first species protected under the 1966 Endangered Species Preservation Act, Pub.L. No. 89–669, 80 Stat. 926, the predecessor to the present Endangered Species Act, when it was listed as threatened with extinction. *See* 32 Fed.Reg. 4001 (March 11, 1967). As the court has previously noted, it is presently listed as endangered. *See* 50 C.F.R. § 17.11. At the evidentiary hearing, the

Government presented testimony that population levels are extremely critical. David Wesley, field supervisor of the Jacksonville Office of Endangered Species of the United States Fish and Wildlife Service, estimated that approximately twenty to fifty Florida panthers remain in the wild. A 1985 Interior Department memorandum discussed the species which would probably be most affected were Indians allowed to take endangered and threatened species for religious purposes. The Florida panther was listed as one of those species. The memorandum stated that, although the *coryi* was listed in 1967 as endangered in Louisiana and Arkansas east to South Carolina and Florida, the species now appears to be confined to southern Florida (DE 20).

David Maehr, a certified wildlife biologist employed by the Florida Game and Freshwater Fish Commission, also estimated that approximately twenty to fifty *coryi* remain in the wild in South Florida. *See also* Gov. ex. 1, at 3. Maehr's primary duties concern research on the Florida panther and involve trapping, collaring, and tracking panthers in order to determine their distribution. The two distinct population centers are located in and around Everglades National Park in southeastern Florida and the Big Cypress National Reserve in southwestern Florida. Sightings of *coryi* are marked on a map of the region received in evidence (Gov. ex. 2) and show that *coryi* frequently and regularly inhabit the Big Cypress Seminole Indian Reservation. *See also* Gov. ex. 1, at 9. Typically, a male panther will roam over a 200 to 300 square mile area while a female's range is 50 to 100 square miles. Maehr stated that the impact of the loss of one breeding adult panther on the propagation of the species would be great. An interagency committee recently adopted a revised "Recovery Plan" for the Florida panther. According to this impressive document, the objective of the plan is "to achieve three viable, self-sustaining populations within the historic range of the animal." Gov. ex. 1, at 14.

The evidence presented by the Government, considered along with the Endangered Species Act and its legislative history, establishes that the governmental interest in protecting the Florida panther on the Seminole Indian Reservations is compelling. Considering the small number of remaining *coryi* and their regular presence on Indian land in South Florida, the cost to the Government of altering its conservation efforts would also be substantial. The governmental interest presented in this case would be substantially harmed by a decision allowing Indians to hunt and possess *coryi* free from regulation on Indian reservations. *See Middleton*, 690 F.2d at 825.

Having assessed the governmental interest, the court must next balance it against the defendant's asserted religious interest in possessing *coryi*. Evidence was presented at the hearing regarding the role of the panther in Seminole religious and cultural practices. This evidence showed that Seminole medicine men help others through chants and prayers and use various animal parts in practicing their medicine. The power of the animal parts comes from the "breathmaker" or God. A medicine man is the most revered person in Seminole culture and tradition. To be trained to practice medicine, a person is "initiated" and then spends the rest of his life trying to gather all of the knowledge in the Seminole tradition.

According to Seminole tradition, the panther was the first choice of the creator to enter the earth. In Miccosukee, the panther is called *cowachobee*. Buffalo Jim, a Seminole medicine man, testified that panther claws are good for cramps and different ailments. Jim Shore, general counsel to the Seminole tribal council, testified that panther parts are an important part of a medicine man's bundle. It is commonly known that panther claws and tails are used for different ailments, and a medicine man should have them on hand in case they are needed to minister to a particular illness. Sonny Billie, a Seminole and Miccosukee medicine man, testified that the panther is an "important" animal for a medicine man, because they are difficult to find, and a person has to be lucky to kill one. Sonny Billie also stated that panther claws provide "number one" relief from muscle

cramps, which cannot be treated as well without the panther part.

The defendant testified that he was initiated into the practice of Seminole medicine in 1983. Although he can practice medicine, he considers himself a "beginner" and will not have the title of medicine man until he has done many deeds or perhaps achieved his first successful operation or healing. The defendant testified that he had no thoughts regarding what he would do with the panther carcass after he shot it until the morning on which it was seized. At that time, it occurred to Billie that he could give it as a gift to a medicine man in order to humble himself. In bestowing such a high honor, Billie hoped that he would be able to learn more medicine.

■ To be protected by the Free Exercise Clause, a belief or practice must be "rooted in religion." *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 713, 101 S.Ct. 1425, 1429, 67 L.Ed.2d 624 (1981); *Wilson v. Block*, 708 F.2d 735, 740 (D.C.Cir.), *cert. denied*, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983), 464 U.S. 1056, 104 S.Ct. 739, 79 L.Ed.2d 197 (1984). The constitution does not require that a religion meet any organizational or doctrinal test in order to qualify for First Amendment protection. Where a party asserts, however, that otherwise lawful and secular governmental action should be prohibited, he must show a constitutionally cognizable infringement of a First Amendment right. *Sequoyah v. Tennessee Valley Authority*, 620 F.2d 1159, 1163 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980). Courts have held the alleged infringements to be cognizable when the practice in question was found to be central or indispensable to religious observances. *See id.* (re-

viewing cases). In this case, Billie has not adequately shown that the possession of panther parts is regular and material to an important religious ceremony or ritual. Although there was testimony that panther parts are important to healing, after having viewed the witnesses, the court is not convinced that panther parts are critical or essential. Sonny Billie stated that panther parts are preferable. They do not appear to be indispensable, however. *Cf. Wilson*, 708 F.2d 735; *Sequoyah*, 620 F.2d 1159. Furthermore, no evidence was submitted that the *coryi* is the only kind of panther found in Florida today. This lack of evidence gives rise to the inference that other subspecies of panther may be available for Indian religious use and demonstrates Billie's failure to show the gravity of the cost to his religious interest imposed by the Government activity. *See Grosz*, 721 F.2d at 734.

Considering the foregoing, the court finds that the evidence has not adequately shown that Billie's religious interest in possessing panther parts[7] should outweigh the compelling governmental interest in protecting the Florida panther. *See id.* Accordingly, the motion to dismiss for overbreadth (DE 19) must be denied.

## VI. CONCLUSION

For the reasons set forth above, the court reaffirms its August 14 order (DE 42) denying defendant's motions to dismiss (DE 19, 20).

---

**7.** For the first time in his reply memorandum (DE 35, at 8), Billie raises the argument that outlawing possession of *coryi* parts without an exception for Indian religious use if the possession has not been involved in the taking does not serve the compelling governmental purpose of prohibiting the killing of the species. The court is not persuaded. In drafting the Endangered Species Act, Congress made possession, carrying, or transportation of protected species a crime in itself. This demonstrates that Con-

gress believed that preventing protected species from being killed is not the only means to rescue it from endangerment. The court also notes Sonny Billie's testimony that the parts of a panther found dead would not be good enough for use by a medicine man, because there would have to be something wrong with that panther. This testimony tends to show a link between hunting *coryi* and possessing their parts. Congress foresaw such a connection when it drafted the Endangered Species Act.