CHURCH OF THE LUKUMI BABALU AYE, INC., and Ernesto Pichardo, Plaintiffs,

v.

CITY OF HIALEAH, Defendant.

No. 87–1795–CIV–EPS.

United States District Court, S.D. Florida, Miami Division.

Oct. 5, 1989.

---

Jorge A. Duarte, Miami, Fla., Mitchell Horwich, Coral Gables, Fla., Maurice Rosen, North Miami Beach, Fla., Stanley

Pred, Arthur B. Calvin, Miami, Fla., for plaintiffs.

Richard G. Garrett, Stuart H. Singer, Laura H. Thomas of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, Fla., for defendant.

## MEMORANDUM OPINION

SPELLMAN, District Judge.

### FINAL JUDGMENT AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE was tried before the Court without a jury on July 31, and August 2, 3, 7, 8, 9, 11, 14, and 15, 1989. Plaintiffs brought this lawsuit pursuant to 42 U.S.C. § 1983 to enjoin, declare unconstitutional, and recover damages for the alleged deprivation of Plaintiffs' constitutional rights, under the First, Fourth and Fourteenth Amendments, by the CITY OF HIALEAH. Plaintiffs claim that Defendant's passage of certain ordinances and resolutions, and Defendants' alleged "process of discouragement, harassment, threats, punishment, detention, and threats of prosecution" violate Plaintiff's constitutional rights. The Church specifically is seeking the right of the Church to perform animal sacrifices on Church premises, and for the right of Church members to perform sacrifices in their own homes.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which provides for original jurisdiction of all civil actions arising under the Constitution and laws of the United States, and 28 U.S.C. § 1343, which provides for jurisdiction of actions brought pursuant to 42 U.S.C. § 1983.

Upon careful consideration of the record, the exhibits, and the memorandum filed by the parties, this Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff, CHURCH OF THE LUKUMI BABALU AYE, INC. ("the Church"), is a not-for-profit corporation organized under the laws of the State of Florida in 1973.[1] Plaintiff, ERNESTO PICHARDO ("Pichardo"), is President of the Church and holds the religious rank of "Italero." Defendant, CITY OF HIALEAH ("the City"), is a municipal corporation situated in the State of Florida.

### A. Background

The Church promotes the Lukumi religion, generically referred to as Yoba or Yoruba, and commonly referred to as Santeria. Yoba or Yoruba is an ancient religion that originated almost 4000 years ago with the Bantu people—the proto-group of the Yoruba people of West Africa, who live mainly in Southern Nigeria. Yoruba is one of the three indigenous religions of the Yoruba people and is practiced openly in Nigeria today.

During the 16th, 17th and 18th centuries, great numbers of Yoba practitioners were enslaved and brought to the eastern region of Cuba,[2] where the practice of their native religion was forbidden. Slaves were expected to become Christians,[3] and practitioners of Yoba were persecuted by the authorities and discriminated against by the populace.

The slaves, to escape the severe penalties and social stigma, began to express the Yoba faith through the use of Catholic

1. Although this Church was incorporated in 1973, the only information this Court has regarding the Church is from Pichardo's testimony. From that testimony, it appears that the Church's activities began at the time that the events leading up to this lawsuit were initiated; i.e., at the time that the Church first leased the property in Hialeah and attempted to obtain their licenses. This Court has no information regarding any Church activities before that time.

2. This area was at one time called Oriente Province. It is now split up into two provinces.

3. One of the justifications for slavery often used by the Spanish government was that they were not really engaging in slavery *per se,* but that they were really engaged in the business of saving souls. Thus, before slaves were loaded onto slave ships, they were often baptized. The slave ships themselves were often given names like "Jesus" and "Estella" (Hope).

saints and symbolism.[4] This syncretism[5] permitted slaves to practice Yoba, or Santeria, while appearing to practice Catholicism.

Thus, for 400 years, Santeria was an underground religion practiced mostly by slaves and the descendants of slaves. Eventually it spilled over from the black population to the white population. However, Santeria was seen as backward, as the religion of slaves and remained underground, first from fear of persecution, and later, from fear of discrimination and social stigma.

Santeria first came to the United States with the Cuban exiles who fled the Castro regime in the late 1950's and early 1960's. Other Afro–Caribbean religions, like Voodoo, Macumba, and Palo Mayombe, arose from the same circumstances in other Caribbean islands, and also exist in South Florida, brought here by natives of those islands.[6] In total, there are approximately 50,000 to 60,000 practitioners of Santeria in South Florida today, and an untold number of people who practice animal sacrifice.

Santeria remains an underground religion and the practice was not, and is not today, socially accepted by the majority of the Cuban population. Additionally, Santeria has lost some contact with its own past in Cuba. Most religious activity takes place in individual homes by extended family groups. There is little or no intermingling of the groups, and few practitioners know others outside their own group that practice Santeria. Santeria has remained underground because most practitioners

fear that they will be discriminated against. The religion has taken on a private, personal tone that is very different than the way that it is practiced in Nigeria. Although Pichardo feels that the religion would become more open if the Church was allowed to practice its rituals openly, Dr. Lisandro Perez, a sociologist, testified that in his opinion, the outcome of this case would not necessarily affect the degree of which Santeria was practiced in private.[7]

Pichardo testified that although he holds the priesthood rank of "Italero," he can not estimate the number of practitioners in the City of Hialeah, nor does he know how many of the members of his Church are priests, or hold any particular rank in the priesthood.[8] Additionally, although Pichardo claims that there are about ten Italeros in Dade County, he has only met two. There is an annual conference of Santeria priests held in New York, but Pichardo testified that he has never been invited to one, nor attended one.

Santeria has an interrelationship of beliefs with conduct of life, i.e., holidays, sabbath, days of worship. There are ceremonies for life cycle events such as child birth, marriage and death rites. Beliefs and practices have remained fairly constant over time, but are based on the interpretation of an oral tradition. There is no organized worship, with a centralized authority, and, with the exception of written tenets prepared by Pichardo (possibly in preparation of this lawsuit), no written code· or tradition appears to exist.[9]

---

**4.** For example, because Saint Peter was associated with iron, the keys to heaven, Yoba practitioners saw Saint Peter as Shango, the god of lightening and thunder.

**5.** Syncretism is a term which refers to the blending of two cultures.

**6.** It is often very difficult for an outsider to tell from religious relics which Afro–Caribbean religion is being practiced. That is one of the problems in identifying the source of the animal carcasses that are left in public. It is hard to tell if they have been left by practitioners of another Afro–Caribbean religion or by practitioners of Santeria whose methods and interpretations differ from what Pichardo believes are the true and universal tenants of Santeria.

**7.** Dr. Perez stated that "[t]here may be a lot of Santeros who may not wish to place their beliefs on a public sort of marketplace."

**8.** The rank of "Italero" is the second highest rank in Santeria although there are different levels of knowledge within that rank. The rank above Italero is "Babalawo." Pichardo testified that he did not know if any member of his Church held the rank of "Babalawo."

**9.** Pichardo prepared a "Code of Beliefs" and "Code of Ethics" that he believes correctly sets forth the oral traditions (as taught to him) which in turn reflect the universal principles of the religion. This document is intended by Pichardo to take the oral tradition and turn it into a written tradition. Pichardo testified that this

Pichardo testifies that priests are trained as apprentices by other priests, guided by the oral traditions. Different priests perform different functions, such as divination, and sacrifice, and a priest must train in each different discipline he wishes to pursue. There is, however, no central authority which establishes, or verifies, a priest's training or credentials.[10]

## B. Animal Sacrifice

Animals, including chickens, pigeons, doves, ducks, guinea fowl, goats, sheep, and turtles, are sacrificed as an integral part of the rituals and ceremonies conducted by practitioners of Santeria. According to Pichardo, most, but not all, of the animals are consumed as food after they are sacrificed.[11] A priest that performs sacrifice is taught as an apprentice through observation of sacrifices. Only priests trained in this manner are supposed to conduct animal sacrifice. Those priests are not involved in obtaining, maintaining, butchering, cooking or disposing of the sac-

rificial animals.[12] Pichardo, even as a high priest, is unaware of how those other functions were actually performed, although he did state that the animals were expected to be healthy, clean and free of disease. The priests receive no training in establishing that an animal is disease-free, but rely on personal observation. Pichardo himself has never been involved in the disposal of animal carcass and has no knowledge of what is actually done with the remains of sacrificed animals, whether or not any part of the animal is consumed.[13]

There appears to be no prohibition in the Santeria religion against animal burial, animal incineration, or animal disposal in sanitary waste containers or animal disposal in any form. Pichardo testified that the Church would have no problem in complying with legal requirements in those areas; but there was no way in which other practitioners, outside the Church itself, could be monitored or controlled; and no legal requirements to which this Court could address itself.[14]

document had gone through the process of being analyzed by a group of elder priests; however, Pichardo gave no evidence to support this claim, and in fact has consistently testified that he doesn't even know which members of the Church are priests.

10. Pichardo testified that it is very difficult to tell who was a practitioner or priest in the Santeria religion. He stated that "[Santeria] does not have this center where people can go and you can monitor and you have a number of set controls over that religious community." Pichardo went on to testify that the Church did establish its own internal identification techniques during the Mariel boatlift because there were a number of refugees that claimed to be priests of the faith:

[T]here were some loose ends out there that were in fact posing to be priests of the faith and were actually doing Santeria or what appeared to be Santeria ceremonies and ripping people literally off, and then they would take several thousand dollars from someone and take off, take off from Miami, and we had no religious or even legal means to be able to make use of or control those situations, so we did the best we could.

11. Animals used in healing rites are almost never consumed.

12. According to Pichardo, the preparation for the animal sacrifice requires that there be several priests, all with different functions. For ex-

ample, there are those who clean-up after the sacrifice; a person who actually handles the animal—inspects the animal to see that it is healthy and clean and then brings that animal to the place where it is to be sacrificed; a priest and his apprentice who actually kill the animal; a person who removes the carcass; a butcher or butchers; a person who takes the butchered animal to be cooked; a cook or cooks. Each function is kept separate from the other and no one else really knows how each person performs his or her function.

13. Pichardo speculated that the remains of sacrificed animals were probably placed in the garbage of the private homes. Pichardo further testified that he has no idea of the average number of animal sacrifice performed each week in the City of Hialeah by priests of the Yoba faith.

14. In the Yoba religion, divination is based on the *ifa* divination cycle. *Ifa* is made up of 256 *odus* or principles. Each *odu* is further subdivided in groups of 16. Divination through *ifa* is usually performed by the casting of shells or stones. The pattern is then read and interpreted as communication from the various deities.

Through divination, *ifa* mandates the type of animal to be sacrificed and the use to which the sacrifice should be put. It is the individual priests, however, who interpret, or misinterpret, the basic principles of *ifa*. Pichardo interprets

Pichardo testified that the actual killing of the animal is taught by oral apprenticeship. The apprentice, by observing an experienced priest, sees where and how the knife should be inserted. Ultimately, the apprentice priest becomes certain that he can adequately perform the sacrifice and do the actual killings assisted by the teacher.[15] After the teacher is satisfied that the student has the ability to perform the sacrifice, the student is allowed to kill the animal without assistance. A student may be taught by more than one priest.

According to Pichardo, an animal that is to be sacrificed is placed on a table on its left side. The apprentice holds the legs and the priest that will perform the sacrifice stands on the other side of the animal and holds the animal's head, with the head facing away from the priest.[16] The animal's head extends beyond the edge of the table and is held high on the nose area by the priest's left hand. The knife is held in the priest's right hand (even if the priest happens to be left-handed).

Pichardo testified that the animal is killed within a matter of moments after being placed on the table. The priest punctures the neck of the animal with a knife[17] right into the main arteries in one move-

ment. The knife is inserted into the right-hand side of the animal's neck and is pushed all the way through the animal's neck. The knife does not actually cut the throat of the animal, but instead goes directly into the vein area, just behind the throat, and in front of the vertebrae. This hopefully would sever both of the main arteries of the animal.

There was expert testimony[18] that established that this method of killing is not humane because there is no guarantee that a person performing a sacrifice in the manner described can cut through both carotid arteries at the same time. Additionally, some of the lining of the artery can recoil and close the artery to prevent the instant hemorrhaging, in a tourniquet effect. Dr. Fox concluded, and this Court finds, that the method used by the priest is not a reliable or painless method of severing both carotid arteries.

Dr. Fox also testified, and this Court finds, that with young goats or sheep, there are deeper arteries within the vertebrae so that these animals would not likely be unconscious instantaneously. Only a complete neck severance can make it clear that the arteries have all been severed and a stabbing or poking is not accept-

the religious principles of Santeria as requiring that a practitioner obey the law; i.e., if the law says that dead animals cannot be disposed of in public roadways, a practitioner could not dispose of the carcass in such a way and still be in compliance with religious principles. However, a priest could interpret *ifa* to require that an animal carcass be left in the open, or even neglect to consult the *ifa* at all regarding the disposal. Pichardo testified that he had a strong feeling that lesser nonhierarchy priests do misinterpret the divination process and could in fact order the disposal of animal remains in public places. Pichardo claims that such a priest would be a deviant, but admits that such a priest could interpret *ifa* in that way.

Pichardo speculated that his Church would be able to stop what he considered to be deviant practices, but gave no indication on how this would be accomplished, beyond just opposing such practices. Pichardo speculates that if the Church is allowed to practice its rituals openly, it will "absorb the thousands that are out there in South Florida and have them come in and not hide behind doors because of fear of persecution and discrimination and what have you." However, Pichardo admits that while he estimates 50,000—60,000 Santeria practitioners in

South Florida, he has no idea how many are located in Hialeah, or how many would actually come forward and join the Church.

15. The teacher and the student both hold onto the knife and the teacher guides the student through the killing stroke a number of times.

16. The priest is standing in a position so that the back of the animal on the table is basically against the front of the priest.

17. The knife is usually approximately 4 inches long.

18. The expert witness, Dr. Michael Fox, is the vice-president of the Humane Society of the United States and directs the Center for Respect for Life and Environment in Washington, D.C. Dr. Fox has a degree in veterinarian medicine from the Royal Veterinary College in London. He also has a Ph.D. in medicine from London University and a Doctor of Science in Animal Behavior Ethology. Dr. Fox has written approximately thirty books, including books on farm animals and caring for poultry, sheep and other livestock.

ed from either a traditional standpoint or a humane standpoint.

A chicken is even more problematic because of the fact that poultry have both internal and external carotid arteries. In other words, there are four carotid arteries that must be severed. Those arteries are rubbery and slide, and this increases the possibility of one of the arteries being missed.

The animal being killed is likely to experience both pain and fear. First, the animals are often kept in close confinement and with animals other than its own species while awaiting sacrifice. This causes great stress and anxiety to the animal. Second, an animal led into a room where other animals had just been killed would perceive the body secretions of the animals that had been killed. Animals that experience fear often secrete chemical metabolites know as thermones, and the odor of these thermones can trigger an intense fear reaction in other animals that detect those odors.[19]

The stress and fear experienced by chickens is particularly dangerous because the chickens' immune systems become affected and this leads to the increased growth of bacteria, salmonella especially, in those chickens' systems. Salmonella is very harmful to humans and a visual inspection of a chicken would not reveal that it had this disease.

Although an expert pathologist, Dr. Wetli, testified for Plaintiffs that the death of the animal, as described, would be very rapid,[20] Dr. Wetli is not a veterinarian and has no knowledge of any biological differences that might impact on his evaluation. Dr. Wetli testified that even though the animal might experience pain, but that the animal's interpretation of the pain might not be the same as a human's. The Court finds that the testimony of Dr. Fox, with his specialized knowledge, is more credible in this area and, accepts Dr. Fox's conclusions that the method used in sacrificing the animals is not humane, but in fact causes great fear and pain to the animal.

According to Pichardo, after the animal is killed, the animal's blood is drained into clay pots placed underneath the animal's head. The animal is then decapitated and removed from the area. The pots of blood are placed before the deities until the animal's carcass is removed.[21] Then, according to the way Pichardo was taught, the blood is also removed and disposed of; but how it is disposed of remains a mystery.

Pichardo testified that in the initiation rite, which lasts for eight days, the sacrifices all occur on the second day, one after another.[22] The initiate and the priests are in a "sacred" room. Only those with a specific function are allowed in the sacred room. The initiate is confined to one corner of the room and must stay in that corner of the room for the entire eight days.[23] The usual age of an initiate is

**19.** Animals may not always appear to be experiencing fear because of a condition known as "tonic immobility" where an animal in intense fear simply freezes, or becomes immobile. Those animals, however, are experiencing both fear and pain. Dr. Fox testified, and this Court finds, that the chance of an animal under these circumstances not defecating or urinating could only occur if the animal was deprived of food and water for a period of time prior to the sacrifice.

**20.** Dr. Wetli defined rapid as being "within less than a minute."

**21.** The number of animals sacrificed and the number of pots of blood collected depend on the number of deities involved in that ceremony. There was some credible testimony that the blood is at times actually drunk, placed on individuals, or left in the pots for long periods, although Pichardo testified that he would find these to be deviant practices. One witness testified that his parents had practiced Santeria and, as a child, he had been offered blood to drink, but had refused.

**22.** Pichardo estimated up to 600 initiations per year are performed in private homes in Dade County. Pichardo admitted that the constant traffic in and out of the house during the eight day initiation rites could disturb the neighbors, as well as the butchering of the animals if the neighbors could observe it. Additionally, Pichardo testified that between 20 and 30 animals are usually sacrificed during an initiation rite. That means that between 12,000 and 18,000 animals are sacrificed in initiation rites alone, during a one year period.

**23.** The initiate can leave the room, under guard, only to use the bathroom facilities.

30–35 years old, but children as young as seven years have been initiated.[24]

The sacrificial animals are brought into the room and led over to the initiate for the initiate to touch. In an initiation ceremony there are between 6 and 13 deities and anywhere from 24 to 56 four-legged animals and fowl are sacrificed.[25]

The animals are butchered, cooked and eaten during the eight day initiation period. The butchering is usually done outside. This Court finds it incredible that so many animals can be properly butchered and cooked in one home in a matter of hours; it is much more likely that this process takes most, if not all, of the remaining seven days.

In the faith healing rites, usually only one animal is sacrificed. The illness is considered to have then passed to the animal. The animal is not eaten, but is either placed on the altar of the deity for several hours, or is disposed of entirely.[26] There was no testimony as to how the animal carcass is ultimately disposed of.[27]

A priest can obtain animals from many different sources. Usually a priest works mostly with one botanica.[28] Pichardo testified that he assumes that the animals are usually purchased from licensed vendors that purchase only animals that have been properly inspected; however, he was never involved in this part of the ritual and the testimony revealed that this is not usually the case. Most animals are bought either from botanicas or from local farms that

breed the animals specifically for sacrifice. Most of the time, botanicas are not licensed to sell or house animals on their premises but will buy the animals from the local farms or transport the animals into the state illegally. The animals are often kept in overcrowded and filthy conditions on the farms. Additionally, when the botanicas buy the animals, they are transported and then kept in the botanicas' back rooms, again often in extremely overcrowded conditions. The animals are not always fed and watered, but instead are kept for only a few days then sold for immediate sacrifice. These conditions can cause intense suffering by the animal.

There was significant testimony about the remains of animals, along with religious paraphernalia, being found in public places.[29] Pichardo admitted that these things happen, but state that some of them are probably the result of other religions that practice animal sacrifice. Pichardo did admit, however, that some of the carcasses were probably the result of Santeria practitioners who were deviating from the correct principles, at least as Pichardo interpreted them.[30]

There have been no instances documented of any infectious disease originating from the remains of animals being left in public places. Animal remains are, however, a health hazard because the remains attract flies, rats and other animals. Both vectors[31] and reservoirs[32] are created

24. Young children are usually only initiated if it is considered a crisis situation, i.e., if the child has some type of illness. Pichardo himself was initiated at age 16. Additionally, children of all ages are permitted to witness the public sacrifices during the annual ceremonies, as long as the parents are present.

25. A usual initiation would involve the sacrifice of six four-legged animals and twenty-four chickens.

26. In the death rites, there are usually one four-legged animal and two fowl sacrificed. Those animals are not consumed either.

27. No witness could recall ever seeing how a carcass was disposed of, even Pichardo, who had himself performed animal sacrifice. The only testimony regarding the disposal of animal

carcasses was the testimony relating to the carcasses found in public places, which some witnesses testified to as being consistent with the practice of Santeria.

28. A botanica is a store that specializes in selling religious articles—usually those articles associated with or used in Santeria and in animals for sacrifice.

29. Animal carcasses are most often found near rivers or canals, by four-way stop signs, under certain palms, and sometimes in people's lawns or on doorsteps.

30. See footnote 14.

31. A vector is a means by which a pathogenic organism is transmitted or transferred from one agent to another agent.

around such animal remains because the rats, flies and other animals that are attracted may themselves carry and exchange diseases and thus the risk of the spread of disease to humans is increased. Flies alone have been known to transmit up to 65 different kinds of human and animal diseases.[33] Areas where dead animals are left can become a harborage for rats and fleas where the spread of disease to other animals and to humans is much more likely.[34]

There was also much testimony regarding the effect on children exposed to animal sacrifices. Dr. Raul Huesmann, a research psychologist, has done extensive research on the development of aggressive[35] and violent behavior in child and adults. He specializes in the study of the effects of the observation of violence on the development of such behavior. Dr. Huesmann testified that the observation of animal sacrifice, particularly in the circumstances of the initiation rite where a number of animals are sacrificed would detrimentally affect the mental health of the child and the behavior in such a way that it would be detrimental to the community in which the child resides. Specifically, the observation would be likely to produce psychological processes that promote greater tolerance of aggressive and violent behavior and might even increase the possibility of aggressive and violent behavior by the child himself.

There are three psychological processes that are involved: 1) desensitization; 2) tolerance; and 3) imitation. Desensitization occurs when the child is exposed to repeated scenes of violence. The child stops reacting emotionally to those acts and the acts become more palatable to the child. Tolerance results from this process of desensitization. Imitation is the final stage. A child is more likely to imitate and be influenced by actors that are perceived as being of high status. In other words, if the child perceives the person engaging in the violent act as a high status person, the effects seem to be exacerbated. This effect would be strongest with multiple acts that are spaced out in time. Dr. Huesmann concluded that a child's observation of animal sacrifice would be likely to increase the probability that the child will behave aggressively and violently, not just against animals but against humans.

The observation of violence is only one factor in the development of aggressive and violent behavior. An individual can have violent and aggressive behavior which is totally unrelated to the observation of violence.[36] Dr. Huesmann did not testify that observation of violence would lead inalterably to violent behavior; just that such observation was more likely to promote such behavior. Whether the aggressive behavior will become serious enough to be a problem would depend on the convergence of a number of other factors.

What Dr. Huesmann did testify to, and what this Court accepts, is that there is a correlation between the observation of violence by children, especially when conducted by persons of perceived high status, and the likelihood of the development of violent and aggressive behavior.[37] The younger the child, the stronger the effect. The Court is convinced that the observation of animal sacrifice can have a detrimental effect on a child's mental health and on that child's future behavior.

32. A reservoir is an area—either another animal, an animate object or an inanimate object—where the organism can lodge and multiply.

33. For example, the more common diseases carried by flies include dysentery, typhoid, cholera, salmonella, salmonosis, infectious hepatitis, yaws, tracoma and many of the parasitic worms. Rats are commonly associated with plague, Leptus pyrosis, and marine typhus.

34. Dr. Wetli, the pathologist that testified for Plaintiffs, agreed with this conclusion.

35. The term "aggression" is used to denote intentional violence, as opposed to the term as it is sometimes used to denote assertive behavior.

36. For example, some persons have various kinds of tumors and abnormalities in certain areas of their brain and, as a consequence, behave very violently.

37. Dr. Huesmann stated that "you would have people who would be more likely to engage in violent acts as adults of a comparable population not exposed to the same scenes."

Dr. Angel Velez–Diaz, a clinical psychologist, disagreed with Dr. Huesmann's conclusions, based on his observations of the clients that he had treated. Dr. Velez–Diaz agreed that observation of violence leads to a desensitization towards violence, but did not believe that this have a negative effect. Dr. Velez–Diaz admitted that the presence of desensitization may help in the production of violent behavior but stated that many other intervening factors would have to occur for such behavior to manifest. Dr. Velez–Diaz felt that because children witnessing animal sacrifices have been prepared for that event, no negative effects would occur. It would become a normal thing, although at first it would create some fear in the child.

Dr. Velez–Diaz has never conducted any studies in the area of the observation of violence by children, but agrees that the majority of studies do find a correlation between such observation and the possibility of an increase in violent behavior. Dr. Velez–Diaz did not think that such studies were valid when applied to children observing ritualistic animal sacrifice, but did not support his conclusion factually. This Court, in exercising its function as trier of fact, finds the testimony of Dr. Huesmann more credible.

A third expert, Ms. Hendrix, an educator at Miami Dade Community College, testified that she had done a study on children's attitudes towards death and had found that children exposed to death, both animal and human, saw death as a much more natural process. Ms. Hendrix concluded that a child that had been prepared to view animal sacrifice would view that sacrifice like any normal religious experience. Ms. Hendrix does not view animal sacrifice as a violent act.

This Court did not find Ms. Hendrix's views persuasive. First, she is completely unfamiliar with the studies done by Dr. Huesmann. Second, her own research had to do with attitudes towards death, not violence. Third, she claimed no personal knowledge regarding how animals were sacrificed, nor did she claim to have any contact with children who had observed such sacrifices.

## C. The Ordinances

The Church occupied land situated at 173 West 5th Street, in Hialeah, Florida, in June of 1987, and began to seek the appropriate licenses to allow it to function as an established Santeria church. The goal was to establish a church, a school, a cultural center and a museum, and to bring Santeria into the open as an established and accepted religion. The Church fully intended to perform all of the religious rituals of Santeria, including animal sacrifice. The Church is currently located at 700 Palm Avenue, Hialeah, Florida, a commercial area.

Just after the Church began to organize and to prepare the land at 173 West 5th Street for occupancy, the Hialeah City Council enacted several ordinances regulating the killing of animals: No. 87–40 (an emergency ordinance adopting the language of the state's anti-cruelty statute, passed June 9, 1987); No. 87–52 (prohibiting the possession of animals intended for sacrifice or slaughter except where zoned, passed September 8, 1987); No. 87–71 (authorizing registered groups to investigate animal cruelty complaints, passed September 22, 1987); and No. 87–72 (prohibiting the slaughtering of any animals on premises not properly zoned for that purpose, passed September 22, 1987).

The City passed the ordinances pursuant to § 828.27, which authorizes municipalities to enact ordinances which are not in conflict with Chapter 828. The ordinances do not conflict with Chapter 828, Florida Statutes but clarify that religious sacrifice of animals is not included in the exemption provided for ritual slaughter in kosher slaughterhouses, and that animal sacrifices violate the anti-cruelty statute of the State of Florida, and the various zoning regulations of the City of Hialeah.

Although the ordinances are not religiously neutral but were intended to stop the practice of animal sacrifice in the City of Hialeah, the ordinances were not passed to interfere with religious beliefs, but rath-

er to regulate conduct. The ordinances have three compelling secular purposes: 1) to prevent cruelty to animals; 2) to safeguard the health, welfare and safety of the community; and 3) to prevent the adverse psychological effect on children exposed to such sacrifices.

Plaintiffs have not been prosecuted by Defendant for any violations or intended violations of these ordinances. Additionally, no groups have been registered or authorized under 87–71 to investigate animal cruelty complaints. Plaintiffs have not sought to amend the City's laws regulating slaughterhouses, but, on July 12, 1989, for the first time sought zoning authorization to operate their current property as a slaughterhouse. At this time, there are no licensed slaughterhouses in the City of Hialeah, and zoning would not permit a slaughterhouse. Plaintiffs have not tried to challenge this zoning.

## D. Discriminatory Treatment

The Church first took possession and began the cleanup of the property located at 173 W. 5th Street, in Hialeah, Florida, on April 1, 1987. The premises required significant work before the Church could move in and actually occupy the buildings.[38]

In early April, 1987, Fernando Pichardo, the administrative director and corporate secretary of the Church, contacted the water and sewer department, Florida Power & Light, and Southern Bell. Fernando Pichardo put a $100 commercial deposit on the water and sewage service and a $200 deposit on the FP & L service. Several

problems then arose. First, the waste service was not provided; although the service was billed to the Church. Second, FP & L shut off the existing power at the Church and refused to reconnect the power until the City gave it final approval and issued a Certificate of Occupancy to the Church.

In registering the Church with the City to obtain the necessary occupational license, Fernando Pichardo ran into several delays. The City required that he provide an original certificate of incorporation from the State of Florida for the Church,[39] and proof of the Church's tax free status.[40] The City also needed to check the zoning of the property to make sure that it was zoned for churches.[41] In all, it took three days to get the necessary information and documents together and register the Church. While Fernando Pichard might have felt that this was unusual, the Court does not find it unusual at all that it took three days to process the application through the City. There was certainly no evidence that any delay resulted from any discriminatory intent, and the testimony did not reveal that the Church was treated any differently than any other applicant.

The application for licensing and zoning approval was originally filled out on May 27, 1987,[42] and completed on May 29, 1987.[43] On May 29, 1987, a Friday, the documentation was turned over to the inspector's department so that the inspectors could come out and do the inspections. On the next Monday, June 1, 1987, several inspectors turned up to do the various necessary inspections. It is the usual practice of that department to inspect premises on

38. Before the Church took possession, the premises had been a used car lot and was in bad repair. There was oil on the ground and car parts lying around; windows were broken; the grass was high; and the buildings needed repair work before they could be occupied.

39. The Certificate of Incorporation needed to have the Church's non-profit status marked on it.

40. It later developed that documentation of sales tax exemption was not necessary.

41. The area was zoned for churches.

42. The application was originally filled out and filed by Ernesto Pichardo after an official of the City came to the premises to tell him that the Church was operating in violation of the licensing requirements. That official drove Pichardo to City Hall to begin the paperwork.

43. That application did not mention that the Church wished to perform animal slaughter. On July 10, 1989, just two weeks before this trial began, the Church for the first time applied for an occupational license to perform animal slaughter for consumption on its premises. That application has been held in abeyance pending the outcome of this litigation.

the next working day after receiving the application.

There were three inspections that the Church premises did not pass on June 1, 1987: the fire inspection, the electrical inspection and the plumbing inspection. The failures were not the result of discriminatory action on the part of the inspectors or any City official. The Church passed the fire inspection two days later.

The Church failed the electrical inspection because of faulty wiring in an air conditioner and a faulty disconnect switch on the outside of the building. The electrical inspector also found an electrical meter that was not designed for that use. The inspector notified FP & L and requested that the power be disconnected from that unsafe meter. A permit was taken out by a licensed electrical contractor on July 7, 1987, and the electrical problems were corrected and completed on July 13, 1987.

The Church failed the plumbing inspection because the South Florida Code requires that for this type of use, separate bathrooms must be installed for men and women. There was only one bathroom on the premises and another bathroom had to be added. A building permit for the additional bathroom was obtained on July 29, 1987 and a plumbing permit was filed for on August 3, 1987. A plumbing inspection was done on August 4, 1987, and the final inspection was called for and issued on August 6, 1987. A certificate of occupancy was issued by the City on August 7, 1987, one day after the final inspection.

Florida Power & Light is prohibited from supplying service to a commercial property that has not been approved for an occupational license nor received an approval on the electrical inspection. The Church's power was disconnected, after a five-day notice to the Church, because it was discovered that it had been turned on without authorization and with the use of the improper meter.[44] As soon as the proper license and approvals were received, the power was turned on. FP & L did not treat this account differently than any other commercial account, except that in disconnecting the service, James Kirk first called FP & L's legal department. He testified that he did this because of the fact that it was a church involved.

The solid waste department failed to pick up the garbage, even though the Church had placed its deposit and was being billed. The water department collects the deposit and does the billing and the waste department has no control over those functions. On the day that the waste department was notified that the Church was not receiving its services, a supervisor went to the premises and obtained a letter of intent to start service on that same day. The waste department then corrected the problem, started service on that same day, and credited the Church's account with the amount that the Church had been billed.

There was testimony to the effect that the council meetings that took place concerning the Church were done in a mob atmosphere and that the council members intended to discriminate against the Church and to stop the Church. There was absolutely no evidence that any council member, at any time, attempted to influence the various licensing, zoning and building departments of the City, or the waste department, FP & L or Southern Bell. The various delays and problems that the Church encountered with its physical plant were either the result of the premises' failure to meet the necessary building requirements, or because of bureaucratic paperwork, and not because of any discriminatory intent on the part of any individual, agency or company.

Plaintiffs complained of two instances of alleged increased law enforcement scrutiny. First, a "police perimeter" was established around the Church premises when the first outdoor mass was held. Second, a police vehicle stopped Fernando Pichardo one night as he was leaving the premises with some trash and asked him what he was doing. When he replied that just leaving the premises, no further conversation was had. This Court does not hold that either of these instances were the result of

44. This led FP & L to conclude that the power had been turned on by other than FP & L.

a discriminatory intent by the City, but, instead, were just instances of the police carrying out their duties. The "police perimeter" was, in fact, a protection for the Church due to the intense and often hostile media coverage.

The Church also alleges that the ordinances were passed because of the council members' intent to discriminate against the Church and to keep the Church from establishing a physical presence in the City. There was no evidence to support this contention. All the evidence established was that the council members' intent was to stop the practice of animal sacrifice in the City. Although this concern was prompted by the Church's public announcement that it intended to come out into the open and practice its religious rituals, including animal sacrifice, the council's intent was to stop animal sacrifice whatever individual, religion or cult it was practiced by.

## CONCLUSIONS OF LAW

### A. Standing

Plaintiffs seek to have the ordinances promulgated by the City of Hialeah declared unconstitutional, both in their totality and as applied to Plaintiffs. The Declaratory Judgment Act, 28 U.S.C. § 2201, requires that before a court can issue declaratory relief, an "actual controversy" must exist. *Emory v. Peeler*, 756 F.2d 1547 (11th Cir.1985). "[T]he continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Id.* at 1551–522. Further, "federal courts should not consider the abstract constitutionality of municipal policies." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1554 (11th Cir.1989).

Standing to sue requires that a plaintiff has suffered a distinct and palpable injury that is likely to be redressed if the requested relief is granted. *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Redressability is an essential component of the standing requirement and Plaintiffs must fail the test if removal of

one purported barrier to their conduct would not secure any meaningful relief because other barriers remained. *Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258, 261–65 (D.C.Cir. 1980); *Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 777 F.2d 598, 606 (11th Cir.1985), *cert. denied*, 476 U.S. 1116, 106 S.Ct. 1973, 90 L.Ed.2d 656 (1986).

If this Court were to find that the ordinances were invalid, Plaintiffs would still be prohibited from performing ritual sacrifices under § 828.12 of the Florida Statutes. *See* Opinion Attorney General 87–56 (1987). Additionally, there are several provisions of the Hialeah City Code that would apply, including zoning provisions, health and sanitation provisions and licensing provisions.

This Court also remains troubled by the ripeness issue. In the instant case, Plaintiffs have not attempted to show repeated prosecutions, or pointed to any enforcement under the ordinances. Additionally, at no point have Plaintiffs raised any free exercise challenge addressed toward the validity of slaughterhouse zoning regulations that Plaintiffs might encounter. Instead, Plaintiffs assert that the city council passed the ordinances in an attempt to target the Church in particular and the practitioners of Santeria generally. Specifically, Plaintiffs allege that the passage of the ordinances was intended to force the Church out of Hialeah, and to chill the religious freedom of Santeria practitioners by imposing criminal sanctions on practices that are an integral part of that religion. This Court therefore restricts itself to the consideration of those issues, and will not resolve the abstract questions of whether all laws restricting animal sacrifice for religious purposes are unconstitutional, or whether Plaintiffs could practice animal sacrifice if they were in an area zoned for slaughterhouses.

### B. State Statutory Preemption

The first argument presented by Plaintiffs is that the City's ordinances are invalid because the ordinances are in conflict

with Chapter 828, Florida Statutes. Specifically, Plaintiffs argue that the ordinances conflict with Florida law because: 1) § 828.22(3) protects the ritual slaughter of animals; and 2) the ordinances provide for a criminal penalty and authorize private parties to assist in the prosecution of violations of the ordinance and thus violate the restrictions on ordinances set forth in F.S. § 828.27.

An ordinance need not be identical with a Florida statute in order to be valid. Validity is presumed and the party challenging a municipal ordinance bears the burden of proving that ordinance is invalid. *Wallace v. Town of Palm Beach*, 624 F.Supp. 864, 869 (S.D.Fla.1985); *Bennett M. Lifter, Inc. v. Metropolitan Dade County*, 482 So.2d 479, 481 (Fla.Dist.Ct.App.1986); *City of Miami v. Kayfetz*, 92 So.2d 798, 801 (Fla. 1957). An ordinance is preempted by state law only where the municipal ordinance directly conflicts with the state statute. *Boven v. City of St. Petersburg*, 73 So.2d 232, 234 (Fla.1954). Thus, the ordinances in the case *sub judice* are only invalid if they conflict with F.S. § 828.27(4).

Florida Statute § 828.27(4) permits a municipality to adopt an ordinance identical to Chapter 828, but forbids a "municipal ordinance relating to animal control or cruelty [from] conflict[ing] with the provisions of" Chapter 828. A municipality need not adopt the exact wording of Chapter 828. Additionally, a municipality may go beyond the state statute so long as it does not conflict with the statute. *Lamar–Orlando Outdoor Advertising v. City of Ormand Beach*, 415 So.2d 1312, 1321 (Fla.Dist.Ct. App.1982); *City of Miami Beach v. Rocio Corp.*, 404 So.2d 1066, 1070 (Fla.Dist.Ct. App.1981). Municipalities often exercise this privilege by providing for greater enforcement measures or stricter controls.

Plaintiffs first claim is that the ordinances conflict generally with the state slaughter laws, F.S. §§ 828.22–828.26, and, specifically, with the ritual slaughter exemption contained in F.S. § 828.22(3). Sections 828.22–828.26, Florida Statutes, relate to the use of humane methods in the slaughter of livestock for food. *See* Opinion Attorney General 87–56 (1987). The statute was enacted to conform Florida law to the provisions of the Federal Humane Slaughter Act of 1958, and is nearly identical to that Act. 7 U.S.C. §§ 1901–1906.

■ The exemption for "ritual slaughter" contained in § 828.22(3) applies only to religious slaughtering of animals for food. Opinion Attorney General 87–56 (1987).[45] For example, an exception has been recognized to apply to the production of Kosher meat where animals are slaughtered according to the Jewish ritual slaughtering method known as *shehitah*. *Jones v. Butz*, 374 F.Supp. 1284 (S.D.N.Y.1974). The Hialeah ordinances, on the other hand, only prohibit sacrificing animals where the primary purpose is not food consumption. Accordingly, there is no conflict between the ordinances and § 828.22(3).

Animal sacrifice also violates Florida Statutes § 828.12, which makes it a criminal violation for one to "unnecessarily" or "cruelly" kill an animal. *See Wilkerson v. State*, 401 So.2d 1110, 1112 (Fla.1981). The Attorney General's opinion notes that the ritual killing of an animal does not constitute a "necessary" killing so as to make the prohibition in § 828.12 against unnecessarily or cruelly killing an animal inapplicable. Hialeah ordinance 87–52 defines "sacrifice" as to "unnecessarily kill, torment, torture or mutilate an animal in a public or private ritual or ceremony not for the primary purpose of food consumption." Thus, the Hialeah ordinance and the Florida Statutes are consistent in their treatment of animal sacrifice.

Plaintiffs next argue that, by exempting ritual slaughter from the provisions of the Act, the legislature intended to preempt municipalities from legislating any regulations whatsoever on ritual slaughter, and thus, Ordinances 87–52 and 87–72 impermissibly regulate slaughter.

**45.** "[O]pinions of the attorney general are persuasive and entitled to great weight in construing Florida Statutes." *State v. Office of Comptroller*, 416 So.2d 820, 822 (Fla.Dist.Ct.App. 1982).

■ Neither ordinance conflicts with the exemption afforded to ritual slaughter. Ordinance 87–52 states that "[n]o person shall ... slaughter ... any ... animal, intending to use such animal for food purposes." Ordinance 87–52 also states that "nothing in this ordinance is to be interpreted as prohibiting any licensed establishment for slaughtering for food purposes where such activity is properly zoned and/or permitted under state and local law and under rules promulgated by the Florida Department of Agriculture." Therefore, ordinance 87–52 only bans slaughter if done outside the regulatory requirements of both local and state laws.

The State of Florida left the siting and inspection of slaughterhouses to localities. See Fla.Stat. § 585.34(3) ("Municipal corporations may establish and maintain the inspections of slaughterhouses"). Land-use control is a local prerogative that is exercised through the use of zoning ordinances. See Fla.Stat. §§ 163.3161—163.3213; Hillsborough Ass'n for Retarded Citizens, Inc., v. City of Temple Terrace, 332 So.2d 610, 612–13 (Fla.1976). Zoning laws and regulations that are enacted by municipalities in the exercise of the municipalities' police power are proper. Scurlock v. City of Lynn Haven, Fla., 858 F.2d 1521, 1525 (11th Cir.1988) ("Municipalities may zone land to pursue any number of legitimate objectives related to the health, safety, morals or general welfare of the community."). Accordingly, the City of Hialeah acted properly in enacting zoning regulations that clarified that ritual sacrifice was not a protected practice under the ritual slaughter exception to the Humane Slaughter Act, and that all slaughters could only be performed in areas zoned for that use.[46]

Plaintiffs next challenge the validity of the ordinances on the ground that the Hialeah ordinances provide for a criminal penalty, while § 828.27(2) only permits a civil penalty. Thus, Plaintiffs argue that the ordinances are in conflict with the state statute and must be struck down.

■ Section 828.27(2) controls penalties in "ordinances relating to animal control or cruelty." Ordinance 87–72 is an ordinance "Prohibiting The Slaughtering Of Animals Upon Any Premises in the City of Hialeah, Florida, Except Those Premises Properly Zoned As A Slaughter House." Ordinance 87–72 provides, in part, that "[i]t shall be unlawful for any person, persons, corporations or associations to slaughter any animal on any premises in the City of Hialeah, Florida, except those properly zoned as a slaughter house, and meeting all the health, safety and sanitation codes prescribed by the City for the operation of a slaughter house.

Ordinance 87–52, and the ordinance amended by it, Ordinance 87–40, also relate to zoning, and provide that:

Nothing in this ordinance is to be interpreted as prohibiting any licensed establishment from slaughtering for food purposes any animals which are specifically raised for food purposes where such activity is properly zoned and/or permitted under state and local law and under rules promulgated by the Florida Department of Agriculture.

Therefore, all three of these ordinances are zoning regulations that explicitly prohibit certain acts except where properly zoned. The penalty requirements of the ordinances, therefore, do not conflict with any penalty requirement if Chapter 828, which is limited only to "ordinance related to animal control or cruelty." While one of the secular purposes of ordinances 87–40, 87–52, and 87–72 is to prevent cruelty to animals, those ordinances are first and foremost zoning ordinances, and are not in and of themselves, "ordinances related to animal control or cruelty."

The City of Hialeah clearly has the authority to prescribe penalties for zoning

---

**46.** The City of Hialeah presently has no areas that are zoned for slaughterhouses. As mentioned before in footnote 41, the Church on July 10, 1989, just before the trial of this matter, applied for an occupations license to perform animal slaughter for consumption on Church premises. Therefore, the issue of whether the Church could receive a zoning variance to perform animal sacrifice, where the animal is to be consumed, has never been directly addressed, and is not before the Court at this time.

violations different from those relating to animal control or cruelty. Because the ordinances do not solely relate to animal control or cruelty, the statute establishing the maximum penalty for violation of such an ordinance is inapplicable.

Additionally, even if § 828.27 did apply to the ordinances, that provision specifically authorizes municipalities to enact an ordinance identical to the state law "except as to penalty." While § 828.27 focuses on ordinances with a civil penalty, another section of that Chapter, § 828.12, directly provides a criminal punishment, as a first degree misdemeanor, for unnecessarily or cruelly beating, mutilating or killing an animal.[47] The City's criminal penalties are therefore fully consistent with the state statutes prescribed penalty for the same misconduct.

Plaintiffs last challenge to the validity of the ordinances concerns the provisions in ordinances 87–71 and 87–72 which provide that agents of private organizations may "assist[ ] in the prosecution of any violation[s]." Plaintiffs argue that this provision conflicts with the state law.

▋ Ordinances 87–71 and 87–72 do not provide for prosecution by agents, only that such agents may assist in the prosecution.[48] This suggests that such agents could assist in testifying, providing evidence, and generally aiding the municipality in pursuing a prosecution. Further, the state statute itself has a provision that provides for appointed agents to investigate violators. *See* § 828.03. This provision was amended to "provide for investigation rather than prosecution of offenders by agents of described societies." Fla.Sta. Ann., Chapter 828, at 431. The Hialeah ordinances certainly do not provide for the agents to prosecute violators, but only to assist in the prosecution. This is certainly within the purview of Chapter 828 and is therefore not in conflict with that statute.

The ordinances at issuance here clearly do not conflict with Florida state law and,

therefore, are not preempted. Accordingly, this Court must now address directly the constitutional issue raised by Plaintiffs.

## C. First Amendment Challenge

This Court feels that there is a need to put this case in the proper perspective. Plaintiffs essentially represent immigrants who have brought to these shores not only the traditions and customs normally attributable to a migrating people, but also the religion of Santeria, a religion which has only recently begun to be practiced in this country. Without question, it extends back to Africa, where it was an openly acceptable form of religion some 400 years ago. After having travelled for four centuries and thousands of miles, it came to Miami and has an estimated 50,000 to 60,000 religious followers in this community.

Migration has been the lifeblood of this country. As each of the tens of thousands came, they brought with them their unique heritages which were ultimately integrated and woven into the fabric which is America. The strength of that fabric has grown over two centuries.

Those who fled poverty found opportunity; those who were deprived of the opportunity of expression found freedom of speech; and those who were deprived of the opportunity to worship God found freedom of religion. These newfound freedoms, however, were not unabridged and absolute. The First Amendment to the United States Constitution reads today as it did when it was ratified on December 15, 1791:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

With the adoption of the Fourteenth Amendment on July 9, 1868, it specifically made the First Amendment applicable to

---

**47.** Section 828.12 was recently amended to include a provision making intentional torture of animals punishable as a felony. *See* Ch. 89–194.

**48.** To date, the City of Hialeah has never appointed any agents under this provision.

state action when it provided that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." If one were to adopt as a constitutional philsophy the writings of John Stuart Mill or John Locke, the privileges afforded under the First Amendment through the Fourteenth Amendment, the freedoms of speech and religion, would be incapable of restriction in any form. As it pertains to particularly freedom of speech, certainly Mr. Justice Black and Mr. Justice Douglas would have seen fit to do so. *See e.g.,* Black, the Bill of Rights, 35 NYU L.Rev. 865 (1960); *Roth v. United States,* 354 U.S. 476, 508, 77 S.Ct. 1304, 1321, L.Ed.2d 1498 (1957) (Douglas, J., dissenting). Neither Justices Black nor Douglas, however, expressed the constitutional philosophy of the courts in giving meaning to the First Amendment to the United States Constitution.

No one for a moment would espouse the view that freedom of speech would allow an individual to shout "Fire" in a crowded theater. Although all ideas having even the slightest redeeming social importance have the full protection of the Constitution, implicit in the history of the First Amendment is the rejection of obscenity as being utterly without redeeming social importance. *Alberts v. California,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308–09, 1 L.Ed.2d 1498 (1957).

Freedom of religion, like freedom of speech, is subject to a similar analysis when we are dealing, as here, with the manner in which the religion is conducted rather than the beliefs of those seeking to exercise it. It is the former and not the latter which is the subject matter of this Court's opinion.

■ Plaintiffs claim that the City's ordinances unconstitutionally impinge upon their free exercise of religion. The Eleventh Circuit has set forth a framework to be used when a court is addressing this issue. *Grosz v. City of Miami Beach,* 721 F.2d 729 (11th Cir.1983), *cert. denied,* 469

U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984).[49] Before the Court balances competing governmental and religious interests, the government's action faces two threshold tests: the law must regulate conduct rather than belief, and it must have both a secular purpose and effect. *Id.* at 733. The government in the case at hand has met both tests.

First, the ordinances clearly are directed at conduct and not belief. The conduct sought to be prescribed is the performance of animal sacrifice. The ordinances do not attempt to regulate belief and thus the law clearly meets the first threshold test.

The second threshold test is whether the ordinances have a secular purpose and effect. *Id.* at 733. Defendant acknowledges that the challenged ordinances arose in response to the opening of Plaintiff Church in the City; however, that does not necessarily indicate that the purpose of the ordinances was to exclude the Church from the City. Instead, the evidence showed that the Defendant responded to Plaintiffs' announced intention that Plaintiffs planned to conduct animal sacrifices.

Defendant was aware that animal sacrifices were being conducted in private homes. That practice was becoming an increasing problem and the Church's announcement triggered this legislative action, which was not aimed solely at Plaintiffs, but was an attempt to address the issue of animal sacrifice as a whole.

The ordinances do not on their face violate the secular purpose test. Ordinance 87–40 adopts the State's animal cruelty laws and does not mention religious conduct at all. Ordinance 87–72 prohibits anyone from slaughtering animals anywhere in the City except in properly zoned slaughterhouses. Ordinance 87–52, adopted from the model statute provided by the Humane Society of the United States to the City Attorney's office, provides that "[n]o person shall ... possess, sacrifice, or slaughter any ... animal for food purposes." This section applies to "any group or indi-

**49.** The district court in *United States v. Billie,* 667 F.Supp. 1485, 1494–97 (S.D.Fla.1987), relied on the analytical steps set forth in *Grosz* to evaluate a Seminole Indian's free exercise challenge to a conviction for taking a Florida panther in violation of the Endangered Species Act.

vidual that kills, slaughters or sacrifices animals for any type of ritual." Ordinance 87–52 therefore acts as a blanket and facially neutral prohibition on the killing of animals by anyone for any reason, except in slaughterhouses. This ordinance was not meant to single out persons engaged in ritual sacrifice, but to put those persons on notice that the state exemption for ritual slaughter only applied to commercial ritual slaughter, done in slaughterhouses.

■ Ordinance 87–71 amends 87–52 to include prosecutorial assistance by registered agents and reiterates the absolute prohibition of sacrifice.[50] The use of the phrase "ritual or ceremony," in ordinances 87–52 and 87–71, does not impermissibly target religious conduct. A federal court, in discussing the meaning of the ritual slaughter exception in the Federal Humane Slaughter Act, recognized that "ritual" is not synonymous with "religious." *Jones v. Butz,* 374 F.Supp. 1284, 1292–93 (S.D.N.Y.), *aff'd,* 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974).[51]

"Ritual" or "ceremony," therefore, reaches not just demonstrably bona fide religious conduct, but also includes the killing of animals by groups that would probably not enjoy First Amendment protection, such as satanic cults. Further, even if the use of the words "ritual" and "ceremony" are understood as targeting primarily religious conduct, nothing in the First Amendment prevents a municipality from specifically regulating such conduct when it is

deemed inconsistent with public health and welfare.[52]

Strict religious neutrality is not required by the First Amendment. *See Wallace v. Jaffree,* 472 U.S. 38, 82–83, 105 S.Ct. 2479, 2503, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring); *McDaniel v. Paty,* 435 U.S. 618, 639, 98 S.Ct. 1322, 1334–35, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring) (noting that "government [may] take religion into account when necessary to further secular purposes"). Courts have repeatedly upheld laws explicitly mentioning religious conduct so long as they serve a secular purpose. *See e.g., Jones v. Butz,* 374 F.Supp. at 1292–93 (noting that explicit religious exemptions in laws are permissible, citing Sunday closing and conscientious objector decisions). Thus, in this case, the ordinances have at most an effect on Plaintiffs' religious conduct that is incidental to the ordinances' secular purpose and effect.

■ After the two threshold tests are passed, the court is faced with the difficult task of balancing governmental and religious interests. This "balance depends upon the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *Grosz,* 721 F.2d at 734. However, before engaging in that balancing process, the Plaintiffs must identify the costs on their religious activities imposed by the government, and these costs must be the consequence of legally cognizable infringements on religious freedom.[53]

---

**50.** Sacrifice is defined as the unnecessary killing of an animal "in a public or private ritual or ceremony not for the primary purpose of food consumption."

**51.** Lower courts are bound by the summary decisions of the Supreme Court, unless reversed by that Court. *Hicks v. Miranda,* 422 U.S. 332, 334–45, 95 S.Ct. 2281, 2284–85, 45 L.Ed.2d 223 (1975).

**52.** Whether the conduct is in fact incompatible with public health and welfare is left to the balancing phase of the free exercise inquiry.

**53.** Plaintiffs cannot maintain a facial challenge to the ordinances. A statute is overbroad on its face only if it is unconstitutional "in every conceivable application" or seeks to prohibit a broad range of protected conduct. *Members of*

*the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984); *see also New York v. Ferber,* 458 U.S. 747, 767–74, 102 S.Ct. 3348, 3359–64, 73 L.Ed.2d 1113 (1982); *Clean-Up '84 v. Heinrich,* 759 F.2d 1511, 1513 (11th Cir.1985). Plaintiffs do not argue that the ordinances would be unconstitutionally applied to the killing of animals for nonreligious purposes, or to inhumane killing. "The possibility that [an ordinance] might be unconstitutionally applied to certain religious practices does not render it void on its face where the remainder of the [ordinance] covers a whole range of easily identifiable and constitutionally proscribable conduct." *Billie,* 667 F.Supp. at 1495. Because these ordinances can constitutionally apply to a wide range of conduct other than Plaintiffs', the ordinances are not void on their face.

Plaintiffs have shown that the practice of animal sacrifice is a integral part of their religion. Further, the evidence has established that not all of the animals sacrificed are consumed.[54] The fact that Plaintiffs have never directly attacked the zoning requirements for slaughterhouses does not dispose of the larger issue of the killing of animals not for food purposes.[55] Thus, this Court has no doubt that the ordinances do burden Plaintiffs' religious practices.

The ordinances at issue were passed by the City because of the perceived need to prevent cruelty to animals, to safeguard the health, welfare and safety of the community, and to prevent possible adverse psychological effects on children exposed to such sacrifices.

### 1) Health Hazard

Courts have routinely upheld bans on religious conduct when such conduct posed a clear danger to the health of the public. For example, courts have, without exception, upheld ordinances and injunctions prohibiting ritual snake handling even when such snake handling was central to the religious practice. *See e.g., State ex rel. Swann v. Pack,* 527 S.W.2d 99, 109 & n. 15 (Tenn.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). Similar reasoning has been used by courts in upholding ordinances banning the use of marijuana despite its centrality to certain religious practice. *See e.g., United States v. Middleton,* 690 F.2d 820, 824–26 (11th Cir. 1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983).[56]

The compelling interests in public health and welfare that motivated the passage of legislation banning snake handling and marijuana use and persuaded the courts to uphold those laws are precisely the government interests at issue here. The evidence at trial revealed a risk of physical harm to members of both Plaintiff Church and the public from disease and infestation. It is beyond dispute that the government has a compelling interest in controlling disease. *See e.g., Prince v. Massachusetts,* 321 U.S. 158, 166–67, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Johansson v. Board of Animal Health,* 601 F.Supp. 1018, 1027 (D.Minn. 1985); *Conner v. Carlton,* 223 So.2d 324 (Fla.1969), *appeal dismissed for want of a substantial fed. ques.,* 396 U.S. 272, 90 S.Ct. 481, 24 L.Ed.2d 417 (1969).

As discussed in detail in this Court's findings of fact, animal carcasses are often left in public places, leading to an increased risk of disease. Additionally, the animals are often obtained from sources that have not maintained the animals in sanitary conditions; nor have the animals gone through any inspection process. This is especially dangerous when dealing with chickens, due to the increased risk of salmonella. Priests have no training in recognizing diseased animals, but rely solely on observation of the animals, an unreliable way of detecting disease. The City, therefore, has more than met its burden of proving that there is a substantial health risk generated by the killing of these animals in areas not regulated as slaughterhouses.

### 2) Welfare of Children

The governmental interest in guaranteeing the welfare of children is particularly strong. *See e.g., New York v. Ferber,* 458 U.S. 747, 756–58, 102 S.Ct. 3348, 3354–55, 73 L.Ed.2d 1113 (1982); *United States v. Nemuras,* 567 F.Supp. 87, 89 (D.Md.1983),

---

**54.** For example, the animals sacrificed in healing rites and in death rites are never consumed.

**55.** Plaintiffs also contend that because the Plaintiff Church is not a "commercial" enterprise, the Church could not qualify under a slaughterhouse zoning variance even if such a variance could be obtained.

**56.** In *Middleton,* this Circuit held that any free exercise interest in marijuana use was outweighed by the compelling state interest in regulating drug use. *Middleton,* 690 F.2d at 825–26.

The Court rejected various state court decisions permitting the religious use of peyote by the Native American Church as not binding and inconsistent with circuit precedent to the contrary. *Id.* at 826. *See also Peyote Way Church of God, Inc. v. Meese,* 698 F.Supp. 1342, 1346–49 (N.D.Tex.1988) (limited federal statutory exemption permitting Native Americans to use peyote was nothing more than a grandfather clause and the court would not expand it into a religious exception regardless of the sincerity of plaintiff's beliefs).

*aff'd*, 740 F.2d 286 (4th Cir.1984); *Griffin v. State*, 396 So.2d 152, 155 (Fla.1981). The Supreme Court has held that the risk of emotional injury to children outweighs countervailing religious and parental rights. *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Jehovah's Witnesses v. King County Hospital*, 278 F.Supp. 488, 504 (W.D.N.D.Wash.1967), *aff'd*, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968).

The evidence at trial established that exposure to the ritual sacrifice of animals imperils the psychological well-being of children and increases the likelihood that a child will become more aggressive and violent. Based on the expert testimony, the City has shown that the risk to children justifies the absolute ban on animal sacrifice.

### 3) Cruelty to Animals

Equally compelling is the City's interest in the protection of animals from cruelty and unnecessary killing. "It has long been the public policy of this country to avoid unnecessary cruelty to animals." *Human Society of Rochester v. Lyng*, 633 F.Supp. 480, 486 (W.D.N.Y.1986). The Florida Supreme Court observed more than two decades ago that "it is now generally recognized that legislation which has for its purpose the protection of animals from harassment and ill-treatment is a valid exercise of the police power." *C.E. America, Inc. v. Antinori*, 210 So.2d 443, 444 (Fla.1968).

Plaintiffs presented testimony that the killing of the animals is not inhumane. This Court does not agree. Expert testimony established that the method of killing is unreliable and not humane, and that the animals, before being sacrificed, are often kept in conditions that produce a great deal of fear and stress in the animal. Often the animals are kept in filthy, overcrowded conditions, and sometimes are not given adequate food or water. Additionally, the animals perceive both pain and fear during the actual sacrificial ceremony.

The policies and purposes underlying the ordinances therefore reflect three separate and compelling governmental interests; public health and the control of disease, the risk to children, and animal welfare. Moreover, the City has a compelling interest in prohibiting the slaughter or sacrifice of animals within areas of the City not zoned for slaughterhouse use. The interest of the city in prohibiting slaughter of animals in private homes and residential area is particularly strong. The assertion that the slaughter is for religious purposes does not diminish this interest because the City may regulate the place and manner of religious expression as long as there is no content classification and so long as the regulation is reasonable. *See Grosz*, 721 F.2d at 740.

An ordinance will withstand constitutional challenge if an exception for religious purpose will "unduly interfere with fulfillment of the governmental interest." *United States v. Lee*, 455 U.S. 252, 259, 102 S.Ct. 1051, 1056, 71 L.Ed.2d 127 (1982). Whether an exception for religious purposes would "unduly interfere" with government policy is a looser standard than whether an ordinance is "closely tailored" or the "least restrictive means" standards urged by Plaintiffs. Moreover, Plaintiffs have not shown that their proposed alternatives would satisfy the public health and animal welfare concerns.[57] Plaintiffs simply speculate, without any factual support, that if they are allowed to practice openly, they would be able not only to control all aspects of the animal sacrifices in a way which would satisfy these concerns,[58] but that, through their example, all other practitioners of Santeria

---

**57.** The alternatives do not address the issues of child welfare or the unreliable method of killing, among others.

**58.** For example, Pichardo testified that the Church would follow any reasonable restrictions on how the animals are obtained and maintained, as well as how the carcasses are disposed of. While this Court believes that Plaintiff is sincere, this is simply not a workable solution because Pichardo himself admits that he doesn't even have an estimate of how many people practice Santeria in the City; nor does he know how those people obtain the animals or dispose of the carcasses. He can only speculate.

would conform their behavior to follow the same guidelines.[59]

Most importantly, the carving out of an exception for any group would defeat the City's valid and compelling interests. Courts have consistently refused religious exemptions when they would create administrative or enforcement problems. *See e.g., Sherbert v. Verner,* 374 U.S. 398, 408–09, 83 S.Ct. 1790, 1796–97, 10 L.Ed.2d 965 (1963); *Grosz,* 721 F.2d at 739. The testimony revealed the extent of the problems caused by animal sacrifice. A large part of the problem is because of the number of practitioners, who are not limited to those who practice Santeria. It is often difficult, if not impossible, to tell who is responsible for a particular sacrifice. A religious exception for Santeria practitioners is simply unworkable because it is unenforceable. Any contemplated exception would have to cover all religions. *See United States v. Aguilar,* 871 F.2d 1436, 1469–70 n. 32 (9th Cir.1989). The exception would, in effect, swallow the rule.

A balance of the compelling government interest served by the ordinances against the burden of Plaintiffs of not being allowed to ritually sacrifice animals, with all of the attendant risks to public health and animal welfare, must be resolved in favor of the City. Even absolute proscriptions of religious conduct are constitutional when the law serves a compelling state interest. *See e.g., Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879) (cited with approval last Term in *Employment Division v. Smith,* 485 U.S. 660, ——, 108 S.Ct. 1444, 1451, 99 L.Ed.2d 753, 764 (1988)). Compelling governmental interests, including public health and safety and animal welfare, fully justify the absolute prohibition on ritual sacrifice at issue here, and any effort to exempt purportedly religious conduct from the strictures of the City's laws would significantly hinder the attainment of those compelling interests. Therefore, this Court holds that the challenged ordinances do pass constitutional muster.

*D. 1983 Claim*

This Court granted Summary Judgment as to the Mayor and City Councilmen and held that the ordinances and resolutions that they passed did not amount to an official policy of harassment. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 688 F.Supp. 1522 (S.D.Fla.1988). At most, this Court found that Plaintiffs had alleged "nothing more than that Defendants, by their policies, created an atmosphere conducive to acts such as these taking place." *Id.* at 1529.

■ Where an injury is inflicted solely by its employees or agents, a local government is not liable. *See Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981) (*respondeat superior* liability unavailable under § 1983). It is only when execution of a municipality's official policy or custom inflicts injury that the government as an entity can be held liable under § 1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Boilerplate allegations of municipal "policy," without any factual allegations to support them, do not establish a § 1983 claim against a municipality. *See City of Canton v. Harris,* 489 U.S. ——, ——, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412, 427 (1989). A single instance of unconstitutional conduct is insufficient to impose civil rights liability on a city unless there is proof that the activity was covered by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker. *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). The existence of an unconstitutional policy and its origin must be separately proved and

---

**59.** Pichardo could give this Court no assurance that those who follow, in his eyes, a deviant form of Santeria, would conform to any regulations at all. Additionally, the religion has always been a secret religion and much is still not known. It is inconceivable that the religious practitioners would accept the type of regulatory controls on their activities that such conformity would require, especially in light of the fact that their sacrifice, by the terms of their religion, must be kept secret and cannot be monitored. A less restrictive ordinance simply could not be enforced.

where the policy relied on is not itself unconstitutional, the plaintiff is required to present more proof than a single incident to establish both the municipality's fault and the causal connection between the policy and the constitutional deprivation. *Id.*

Cases involving analogous constitutional challenges to municipal land-use restrictions place the burden of proving discriminatory purpose or intent on plaintiffs. *See, e.g., Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 707 n. 4, 106 S.Ct. 3172, 3178 n. 4, 92 L.Ed.2d 568 (1986); *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 270, n. 21, 97 S.Ct. 555, 566, n. 21, 50 L.Ed.2d 450 (1977). Nor does evidence of a negative public outcry directed against the Church prove discriminatory zoning. *See Town of Hialeah Gardens v. Hebraica Community Center, Inc.,* 309 So.2d 212, 215 (Fla.Dist.Ct.App.1975).

█ Plaintiffs have completely failed to prove any acts of discrimination or harassment in violation of Plaintiffs' right to freely exercise their religion. As discussed at length in this Court's findings of fact, the Plaintiffs' allegations of discrimination by the City are not supported by the facts.

### CONCLUSION

The ordinances passed by the City of Hialeah regulating the ritual sacrifice of animals are consistent with both state statutes and the United States Constitution. The ordinances target the indiscriminate slaughter of animals in areas of the City not zoned for such activities because of the many attendant risks to both public health and animal welfare. The ordinances are not targeted at the Church of the Lukumi Babalu Aye and practitioners of Santeria, but are meant to prohibit all animal sacrifice, whether it be practiced by an individual, a religion, or a cult. Additionally, there was no proof of any discriminatory action by the City against the Plaintiff Church or any of its practitioners.

Accordingly, it is hereby

ORDERED AND ADJUDGED that the Court finds in favor of Defendant and against Plaintiffs, and FINAL JUDGMENT is hereby entered in favor of Defendant, CITY OF HIALEAH, and against Plaintiffs, who shall go hence without day. Each party shall bear its own costs and attorneys' fees.

DONE AND ORDERED.